956 So.2d 583 (2007)
Helen C. SIMS
v.
MULHEARN FUNERAL HOME, INC. and Mulhearn Protective Insurance Company.
No. 2007-CA-0054.
Supreme Court of Louisiana.
May 22, 2007.
*585 Breithaupt, Dunn, Dubos, Shafto & Wolleson, Walter C. Dunn, Jr., Gaudry, Ranson, Higgins & Gremillion, Daniel Aubry Ranson, Gretna, Charles C. Doti, Jr., Attorney General, David A. Young, Assistant Attorney General, for Appellant.
Diliberto & Kirin, Robert John Diliberto, New Orleans, Linda Suzanna Harang, Jefferson, Charles Shelby Norris, Jr, for Appellee.
James Houston Morgan, III, Baton Rouge, for Louisiana Insurers' Conference (LIC), Amicus Curiae.
Van Robinson Mayhall, III, Van Robinson Mayhall, Jr., Baton Rouge, and Michael Paul Fruge, for Louisiana Life and Health Insurance Guaranty Assn. (LLHIGA), Amicus Curiae.
Robert Thomas Myers, Metairie, for Louisiana Funeral Directors Association, Amicus Curiae.
Susie Morgan and Robert Reid Wood, Jr., for Kilpatrick Life Insurance Company, Amicus Curiae.
Crawford Allen Rose, III, for AARP, Amicus Curiae.
WEIMER, Justice.
This case is on direct appeal from a judgment declaring 2004 La. Acts No. 689, codified as LSA-R.S. 22:253(A), unconstitutional. We pretermit consideration of the constitutional issue because our review of the pleadings and evidence convinces us that consideration of the effect of Acts 2004, No. 689 is not necessary to decide this case, which can be resolved on the clear and unambiguous language of the insurance policies at issue. Further, upon conducting a de novo review of the pleadings and evidence, and finding no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law, we reverse the judgment of the district court and grant summary judgment in favor of defendants.

FACTS AND PROCEDURAL HISTORY
During his lifetime, Claude Sims purchased two industrial life insurance policies[1] from Mulhearn Protective Insurance Company, both of which name his wife, Helen C. Sims, as beneficiary. The first policy was issued on January 24, 1958. This policy has a face amount of $500.00. It requires the payment of monthly premiums in the amount of $1.38 for twenty years, which Mr. Sims paid in full. The second policy was issued on September 1, *586 1963. This policy also has a face amount of $500.00. It requires the payment of monthly premiums in the amount of $2.60 until Mr. Sims' death. As with the first policy, the premiums on this policy were paid in full. Both policies provide that upon the death of the insured, funeral benefits in the face amount of the policies will be furnished, which shall include the following: casket and outside case, burial garments if requested, preparation of body, funeral coach, arrangement and transportation of flowers, conducting of funeral, furnishing information to newspapers, cemetery equipment, chairs, use of funeral home, acknowledgment cards, candelabra and "Prie Dieu"[2] when desired.
Mr. Sims died on May 7, 2003. Shortly thereafter, his widow, Helen Sims, went to the funeral home operated by Mulhearn Funeral Home, Inc., the "Official Funeral Director" designated in the policies, to make arrangements for her late husband's funeral. Mrs. Sims presented the insurance policies to Mulhearn's funeral director, who explained that the combined maximum benefits available under the two policies was $1,000.00, which could be given to her as a credit toward the total cost of the funeral. Mrs. Sims expressed dissatisfaction with this explanation, being of the opinion that the policies provided for a full funeral service at no additional cost to the beneficiary. Nevertheless, she contracted with the funeral home to provide funeral services at a total cost of $5,998.39, reduced by the $1,000.00 in benefits paid by the insurance company.
On August 22, 2003, Mrs. Sims filed the instant lawsuit against Mulhearn Funeral Home, Inc. and Mulhearn Protective Insurance Company (hereinafter collectively referred to as "Mulhearn") seeking damages for breach of contract, breach of fiduciary duty, negligent misrepresentation, and negligent infliction of emotional and mental distress. The petition requests certification as a class action, filed on behalf of Mrs. Sims and all other persons or entities who are beneficiaries and/or heirs of deceased insureds who purchased insurance polices from Mulhearn providing that certain funeral benefits would be furnished by Mulhearn upon the death of the insured.
The Mulhearn defendants answered the petition, generally denying liability and asserting several affirmative defenses. The plaintiff, in turn, filed a motion for class certification. While this motion was pending, the Mulhearn defendants filed a motion for summary judgment seeking dismissal of plaintiff's claims on two grounds. First, the defendants argued that the policies issued to Mr. Sims plainly state that the benefits to be provided are subject to the $500.00 face amounts of insurance coverage shown in the policy schedules, and that, according to the clear and unambiguous language of the insurance contracts, defendants complied with their obligations under the policies by issuing plaintiff a credit of $1,000.00 toward the cost of the funeral. As support for this argument, and as an additional ground for relief, defendants cited to the provisions of LSA-R.S. 22:253(A), as amended by 2004 La. Acts No. 689. This statute provides:
A. (1) Every funeral policy shall state the dollar value of the funeral to be furnished and shall specify therein those benefits which shall constitute the funeral to be furnished. If upon the death of the insured, the dollar value of the funeral to be furnished, as stated in the policy or policies, is less than the retail *587 price of the funeral benefits specified in the policy or policies, the beneficiary shall be entitled to a cash payment which shall be equal to one hundred percent of the face amount of the policy or policies.
(2) It is the intent of the legislature that under no circumstances shall an insurer be required to provide services or reimburse to a beneficiary at amounts greater than the stated dollar amount of the policy.
(3) The provisions of this Subsection are interpretive of Part VII of Chapter 1 of the Louisiana Insurance Code and are intended to explain the original intent.
(4) The provisions of this Subsection shall be applicable to all claims existing or actions pending on July 6, 2004 and all claims arising or actions filed on or after July 6, 2004. The provisions of this Paragraph shall not be construed to effect any claim arising from or involving any misrepresentation as to the terms and conditions of the policy by an insurer or its agent to the insured.
Defendants argued that both on the basis of the plain language of the insurance contracts and on the law as evidenced in the newly enacted statute, LSA-R.S. 22:253(A), they were entitled to summary judgment, dismissing plaintiff's claims.
Plaintiff responded to defendants' motion for summary judgment by filing a "Motion to Declare Louisiana Act 689 of 2004 Unconstitutional," asserting that the retroactive application of Act 689 to class action plaintiffs' claims contravenes the plaintiffs' due process guarantees by divesting them of their vested property rights in causes of action that accrued prior to the effective date of the Act.
On February 10, 2006, the district court conducted a hearing on defendants' motion for summary judgment, plaintiff's motion to declare Act 689 of 2004 unconstitutional and plaintiff's motion for class certification. Following that hearing, the court denied Mulhearn's motion for summary judgment for two reasons: 1) the motion was based primarily on Act 689, which the court expressly declared unconstitutional; and 2) disputed issues of material fact precluded summary judgment as a matter of law. On the issue of the constitutionality of Act 689 of 2004, the court ruled that retroactive application would divest plaintiff of vested contractual rights as beneficiary under her late husband's insurance policies, in violation of the due process and contract clauses of the United States and Louisiana constitutions. In examining the constitutional issue, the court found that the history of the amendments to LSA-R.S. 22:253(A) does not support the legislature's declaration that Act 689 is interpretive and, therefore, subject to retroactive application, and that the statute does not serve a public purpose such as would justify alteration of contractual expectations. Finally, the district court found that all of the requirements for class certification had been satisfied and granted plaintiff's motion seeking class certification. A judgment memorializing the court's rulings was signed on June 27, 2006. The judgment was certified as final pursuant to the provisions of LSA-C.C.P. art. 1915(B)(1).
The Mulhearn defendants suspensively appealed the district court judgment to this court, which has jurisdiction over the appeal pursuant to Article V, § 5(D)(1) of the Louisiana Constitution.[3] By virtue of La. Const. art. V, § 5(F), that jurisdiction extends not only to the constitutional issue, *588 but to all issues ruled on by the district court.[4]Cat's Meow, Inc. v. City of New Orleans Through Department of Finance, 98-0601, p. 16 (La.10/20/98), 720 So.2d 1186, 1198; Church Point Wholesale Beverage Co., Inc. v. Tarver, 614 So.2d 697, 700-701 (La.1993).

LAW AND ANALYSIS
Constitutional Issue
As a preliminary matter, we note the pleading which prompted plaintiff's challenge to the constitutionality of Act 689 was defendants' motion for summary judgment. A review of that motion and the arguments presented therein reveals the primary argument advanced by the defendants in support of their motion for summary judgment was one of contractual interpretation. The defendants argued that this case can be resolved within the four corners of the insurance contracts, and the language of the policies issued to Mr. Sims is clear and unambiguous, plainly limiting the benefits under each policy to the stated face amount of coverage. As an additional argument, the defendants posited that LSA-R.S. 22:253(A), as amended by 2004 La. Acts No. 689, provides statutory support for the interpretation of the policies dictated by the contractual language. In other words, the applicability of Act 689 was presented as an additional or alternative argument to defendants' primary contention that the language of the insurance contracts controls the resolution of this case.
Given this presentation of the issues, it is proper for this court to first determine whether the case may be disposed of on non-constitutional grounds, i.e., on grounds of contractual interpretation, before reaching the constitutional issue. Denham Springs Economic Development District v. All Taxpayers, Property Owners, 04-1674, p. 5 (La.2/4/05), 894 So.2d 325, 330; Louisiana Municipal Association v. State, 04-0227, p. 34 (La.1/19/05), 893 So.2d 809, 836. In following this course, we pay heed to the well-settled precept that courts should refrain from reaching or deciding the constitutionality of legislation unless, in the context of a particular case, the resolution of the constitutional issue is essential to the decision of the case or controversy. Ring v. State, Department of Transportation and Development, 02-1367, p. 4 (La.1/14/03), 835 So.2d 423, 426; Cat's Meow, Inc., 98-0601 at 16-17, 720 So.2d at 1199; Louisiana Associated General Contractors, Inc. v. New Orleans Aviation Board, 97-0752, p. 4 (La.10/31/97), 701 So.2d 130, 132. Although courts generally possess the power and authority to decide the constitutionality of challenged statutory provisions, we have consistently held that a court is required to decide a constitutional issue only if the procedural posture of the case and the relief sought by the appellant demand that it do so. State v. Citizen, 04-1841, p. 12 (La.4/1/05), 898 So.2d 325, 334. Therefore, mindful of our long-standing admonition that courts should avoid constitutional questions whenever a case can be disposed of on non-constitutional grounds, Ring, 02-1367 at 5, 835 So.2d at 427, we first address the argument that the case can be resolved on the basis of the language of the insurance contracts at issue without regard or resort to the amended statute.
Contract Analysis
In analyzing insurance polices, certain elementary legal principles apply. First and foremost is the rule that an *589 insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. LeBlanc v. Aysenne, 05-0297, p. 3 (La.1/19/06), 921 So.2d 85, 89; Edwards v. Daugherty, 03-2103, p. 11 (La.10/1/04), 883 So.2d 932, 940; Cadwallader v. Allstate Insurance Co., 02-1637, p. 3 (La.6/27/03), 848 So.2d 577, 580; Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co., 93-0911, p. 5 (La.1/14/94), 630 So.2d 759, 763.
According to those rules, the responsibility of the judiciary in interpreting insurance contracts is to determine the parties' common intent. See, LSA-C.C. art. 2045; Edwards, 03-2103, p. 11, 883 So.2d at 940; Cadwallader, 02-1637 at 3, 848 So.2d at 580; Blackburn v. National Union Fire Insurance Co. of Pittsburgh, 00-2668, p. 6 (La.4/3/01), 784 So.2d 637, 641. Courts begin their analysis of the parties' common intent by examining the words of the insurance contract itself. See, LSA-C.C. art. 2046; Succession of Fannaly v. Lafayette Insurance Co., 01-1355, p. 3 (La.1/15/02), 805 So.2d 1134, 1137; Blackburn, 00-2668 at 6, 784 So.2d at 641 ("[T]he initial determination of the parties' intent is found in the insurance policy itself."). In ascertaining the common intent, words and phrases in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning. See, LSA-C.C. art. 2047; Edwards, 03-2103 at 11, 883 So.2d at 940-941; Cadwallader, 02-1637 at 3, 848 So.2d at 580; Succession of Fannaly, 01-1355 at 3, 805 So.2d at 1137.
An insurance contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions. One provision of the contract should not be construed separately at the expense of disregarding other provisions. See, LSA-C.C. art. 2050; Hill v. Shelter Mutual Insurance Co., 05-1783, p. 3(La.7/10/06), 935 So.2d 691, 694; Succession of Fannaly, 01-1355 at 4-5, 805 So.2d at 1137; Peterson v. Schimek, 98-1712, p. 5 (La.3/2/99), 729 So.2d 1024, 1029. Neither should an insurance policy be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. LeBlanc, 05-0297, at 3, 921 So.2d at 89; Edwards, 03-2103 at 11, 883 So.2d at 941; Cadwallader, 02-1637 at 3, 848 So.2d at 580; Peterson, 98-1712 at 5, 729 So.2d at 1028.
When the words of an insurance contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and courts must enforce the contract as written. See, LSA-C.C. art. 2046; Hill, 05-1783 at 3, 935 So.2d at 694; Peterson, 98-1712 at 4-5, 729 So.2d at 1028. Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms. Cadwallader, 02-1637 at 4, 848 So.2d at 580; Succession of Fannaly, 01-1355 at 4, 805 So.2d at 1138. The rules of contractual interpretation simply do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clarity the parties' intent. Edwards, 03-2103 at 12, 883 So.2d at 941; Succession of Fannaly, 01-1355 at 4, 805 So.2d at 1138; Peterson, 98-1712 at 5, 729 So.2d at 1029.
Nevertheless, if, after applying the general rules of contractual interpretation *590 to an insurance contract, an ambiguity remains, the ambiguous contractual provision is generally construed against the insurer and in favor of coverage. See, LSA-C.C. art. 2056; Succession of Fannaly, 01-1355 at 4, 805 So.2d at 1138; Peterson, 98-1712 at 5, 729 So.2d at 1029. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. Edwards, 03-2103 at 12, 883 So.2d at 941; Cadwallader, 02-1637 at 4, 848 So.2d at 580; Carrier v. Reliance Insurance Co., 99-2573, p. 12 (La.4/11/00), 759 So.2d 37, 43. This strict construction principle applies, however, only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. Edwards, 03-2103 at 12, 883 So.2d at 941; Cadwallader, 02-1637 at 4, 848 So.2d at 580; Carrier, 99-2573 at 12, 759 So.2d at 43.
The determination of whether a contract is clear or ambiguous is a question of law. Edwards, 03-2103 at 12-13, 883 So.2d at 941; Cadwallader, 02-1637 at 4, 848 So.2d at 580; Louisiana Insurance Guaranty Association, 93-0911 at 7, 630 So.2d at 764. Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate. Robinson v. Heard, 01-1697, p. 4 (La.2/26/02), 809 So.2d 943, 945; Peterson, 98-1712 at 5, 729 So.2d at 1029.
With the foregoing basic principles in mind, we turn to an examination of the policies at issue to determine the coverage, or benefits, afforded by the policies and whether any ambiguity exists with respect thereto.
The two policies involved in this case, although issued in 1958 and 1963, contain similar language. The 1958 policy provides, in pertinent part, that the insurer, Mulhearn Protective, "[d]oth hereby agree, subject to the provisions printed on the back hereof, . . . to furnish and conduct at the time of the death of the Insured named below, . . . all funeral benefits provided." Under the heading "Benefits" appears the following paragraph:
Upon the death of the person Insured under this Policy while in force, unless such person be less than four years of age, benefits in the face amount shown in the above schedule will be furnished, which shall include the following: delivered within a radius of sixty-five (65) miles from Monroe, Louisiana; Rayville, Louisiana; Winnsboro, Louisiana, or any other point that may hereafter be designated by the Company; Casket and outside case, burial garments if requested, preparation of body, funeral coach, arrangement and transportation of flowers, conducting of funeral, furnishing information to newspapers, cemetery equipment, chairs, use of funeral home, acknowledgment cards, candelabra and Prie Dieu when desired. These benefits do not include cemetery burial plots, or any other service not specifically enumerated. The relatives of the deceased shall have the privilege of selecting the casket and burial garments with reference to design and according to values as provided in this Policy.
The referenced schedule appears immediately above the quoted paragraph and sets forth the following: *591 

----------------------------------------------------------------
Name of Ultimate Amount Age Monthly
Insured Of Insurance Next Birthday Premium
----------------------------------------------------------------
Claud Sims $500.00 44 $1.38
----------------------------------------------------------------
BENEFICIARY: Helen C. Sims Date of Issue: January 24, 1958
----------------------------------------------------------------

The 1963 policy is substantially similar, with minor deviations in language.[5]
The defendants contend that the foregoing language clearly and unambiguously provides for the furnishing of funeral benefits equal in value to the amount of coverage shown on the policy schedules and that the "Ultimate Amount of Insurance" or "Ultimate Funeral Benefit" shown to be available under each policy schedule is $500.00, which plaintiff received in the form of a $1,000.00 credit paid toward her late husband's funeral. The plaintiff, on the other hand, contends that the language provides for a complete funeral, at no additional cost to the insured and/or his or her beneficiaries, regardless of the amount of coverage purchased.
In advancing her argument that the policies provide for a full funeral, at no additional cost, the plaintiff cites first to the language in the policies through which the insurer promises to "furnish," upon the death of the insured, the "funeral benefits" (or, in the case of the 1963 policy, the "funeral") described, and then to the language describing the benefits that "shall" be included, i.e., casket and outside case, burial garments if requested, preparation of body, funeral coach, arrangement and transportation of flowers, conducting of funeral, furnishing information to newspapers, cemetery equipment, chairs, use of funeral home, acknowledgment cards, candelabra and "Prie Dieu" when desired.
Plaintiff's argument that this language obligates Mulhearn to provide the described merchandise and services at no additional cost to the insured is based on an overtly narrow and selective reading of the policies that ignores other equally relevant policy provisions. Such a narrow focus is improper. In keeping with the well-established rules of contractual interpretation recited above, an insurance policy is to be construed as a whole and each provision in the policy must be interpreted in light of *592 the other provisions. One provision cannot be construed separately at the expense of disregarding other provisions. LSA-C.C. art. 2050; Succession of Fannaly, 01-1355 at 3-4, 805 So.2d at 1137; Peterson, 98-1712 at 5, 729 So.2d at 1029. In determining whether a policy provides coverage, every provision of the policy must be read and interpreted. Only then can a determination of coverage be made. Sucession of Fannaly, 01-1355 at 6, 805 So.2d at 1139.
In this case, the interpretation of the policy language urged by plaintiff can only be adopted by reading out or ignoring other provisions of the policies. For example, the policies at issue both clearly state that upon the death of the insured "benefits in the face amount shown in the above schedule will be furnished, which shall include . . ." followed by a description of the "benefits" included. The description of "benefits" on which plaintiff relies is thus qualified by the provision immediately preceding it, making the "benefits" subject to the "face amount shown" in policy schedules. Those schedules, moreover, set forth in clear and unambiguous terms the "Ultimate Amount of Insurance" and/or "Ultimate Funeral Benefit" available, which in each policy is stated to be $500.00. In addition, the last sentence of the paragraph on which plaintiff relies ties the description of services or "benefits" available under the policy to the face amount of the policies. It provides that "[t]he relatives of the deceased shall have the privilege of selecting the casket and burial garments with reference to design and color according to values as provided in this Policy," (emphasis supplied), plainly contradicting plaintiff's contention that the policies provide for a funeral service including the specified "benefits," regardless of the amount of coverage purchased.
A clear reading of the policy language reveals that, contrary to plaintiff's apparent contention, the clauses in the policies (1) stating the dollar value of the funeral to be furnished and (2) describing the benefits which shall constitute the funeral to be furnished are not competing clauses, but complementary clauses, the second clearly limited by the dollar amounts specified in the first. In this connection, it is significant to note that the plaintiff does not claim that the quoted language of the policies is ambiguous; rather she focuses on selected language in the policies, ignoring all contrary provisions, to argue that what was purchased through the policies was a funeral, not a funeral valued at $500.00.
The only ambiguity alleged by the plaintiff in connection with the policies is her contention that the policies are silent as to the amount of credit that will be given or the goods or services that can be substituted when the specified goods and services either cannot or will not be provided, and this silence creates an ambiguity which must be construed against the insurer and in favor of coverage. The problem with this argument is twofold.
First, it ignores clear language in the policy issued in 1963, which contains the following provision: "Should the Company deem it impractical to furnish a funeral service in accordance with the terms of this Policy, they shall, in lieu thereof, pay the full face amount of the Policy in cash to the beneficiary named herein." Thus, at least as respects the 1963 policy, the insurance contract is not silent as to the amount of credit that will be given when the specified services cannot be provided; it provides for a cash payment equal to the face amount of the policy, which in this case the beneficiary, Mrs. Sims, assigned to the funeral home. See, Wilson v. Reliable Life Insurance Co., 333 So.2d 680 *593 (La.App. 2 Cir.1976).[6] In Wilson, the court, in interpreting a policy provision similar to that in the policy issued to Mr. Sims in 1963, found that a policy with a face value of $150.00, issued in 1943, could not practically pay for a funeral as described in the policy in 1974. Since it would have been impractical for the insurance company to provide the services because the cost of funerals had risen, the cash benefit as provided for in the policy was due.
Second, under the rules of contractual interpretation previously referenced, to the extent either of the policies can be interpreted to be silent with respect to what happens when the face amount of insurance policies purchased years previously is no longer sufficient to pay for the funeral described in the policy, that silence does not create an ambiguity that must be strictly construed against the insurer in favor of coverage. The rule of strict construction applies only if an insurance policy is susceptible to two or more reasonable interpretations. Edwards, 03-2103 at 12, 883 So.2d at 941; Cadwallader, 02-1637 at 4, 848 So.2d at 580; Carrier, 99-2573 at12, 759 So.2d at 43.
An interpretation of the policies to provide for a complete funeral, at no additional expense, regardless of the amount of coverage purchased, is not reasonable, and would lead to absurd consequences. Under such an interpretation, an insured, such as Mr. Sims, who paid a premium based on a $500.00 policy would receive the exact same benefits as an insured who paid a greater premium for a $2,500.00 policy. It simply is not reasonable to ascribe to the contracting parties an intention to provide and/or receive the same benefits regardless of the amount of coverage obtained or the amount of premiums paid. As explained in Walters v. Reliance Industrial Life Insurance Co., 180 So. 880 (La. App. 2 Cir.), writ denied (La.1938):
The purpose of an industrial contract like the one under consideration is to make available to persons of moderate means sufficient funds for a suitable and decent burial of a loved one at the time of his passing. The amount deemed to be necessary for such an occasion is decided upon by the contracting parties when the policy is issued, and usually it controls the fixing of the premiums that are thereafter to be periodically paid for a continuation of the insurance.
Walters, 180 So. at 883. In this case, Mr. Sims initially elected to purchase a $500.00 policy, although at the time he purchased the first policy, he could have purchased a policy providing benefits up to a maximum of $1,250.00.[7] Premiums for that policy were assessed based on the face amount of the policy. In 1963, Mr. Sims purchased a second policy with a face amount of $500.00. Obviously, it was the intention of the parties to limit the value of the policies *594 to the amount shown on the face of the policies and not to provide a complete funeral service; otherwise, there would have been no reason for Mr. Sims to purchase a second policy. To construe the policies to provide for a full funeral service, at no additional cost, regardless of the amount of coverage purchased, leads to unreasonable and even absurd consequences.[8] The rules of contractual interpretation do not permit courts to interpret an insurance policy in an unreasonable manner to enlarge its provisions beyond what is reasonably contemplated by its terms or to achieve an absurd conclusion. LeBlanc, 05-297 at 3, 921 So.2d at 89; Edwards, 03-2103 at 11, 883 So.2d at 941; Cadwallader, 02-1637 at 3, 848 So.2d at 580. In this case, there is no ambiguity in the Mulhearn policies because there is only one reasonable interpretation of the language of those policies.[9]
Thus, the insurance policies issued to Mr. Sims clearly and unambiguously provide that the "benefits" under each policy are limited to the amount of coverage identified on the face of each policy as the "Ultimate Amount of Insurance" or "Ultimate Funeral Benefit." This interpretation of the policies is in line with earlier cases interpreting similar policy language. In Allen v. Enterprise Benevolent & Burial Ass'n., 159 So. 127 (La.App. Orl.1935), an insurer issued a policy in which it agreed to provide a funeral valued at $100.00 and a death benefit of $50.00 upon the death of the insured. The insurer wrongfully denied coverage. As a result, the family was forced to hire an undertaker and incur burial expenses in excess of $100.00. The court ordered the insurer to pay the face amount of the policy, even though the insurer could have provided a funeral for less than the face amount, and even though, as a result of the wrongful denial of coverage, the family incurred expenses in excess of the face amount of the policy. Similarly, in Oliver v. Reliable Life Insurance Co., 362 So.2d 1169 (La.App. 2 Cir.1978), a policy was issued by the defendant insurer which provided that upon the death of the insured, the defendant would furnish a $1,000.00 funeral service. A clause in the policy entitled "Optional Cash Settlement" provided that should the beneficiary not use the services provided by the policy, the company would pay 75 percent of the face value of the policy. The defendant denied coverage under the policy, and the beneficiary paid $1,060.00 for the funeral. After concluding that the defendant insurer wrongfully denied liability under the policy, the court held that the beneficiary was entitled to 75 percent of the face value of the policy, as provided in the policy. See also, Walters, 180 So. at 883, wherein an insurer refused to honor a group burial policy with funeral benefits in *595 the amount of $250.00, and the widow was forced to expend $131.20 for her husband's funeral. The court held that plaintiff was entitled to recover under the policy, and that the plaintiff was not limited to the actual cost of the funeral, but was entitled to receive the face amount of the policy.
In the absence of conflict with a statute or public policy, insurers have the same rights as individuals to limit their liability and impose whatever conditions they desire upon their obligations. Cadwallader, 02-1637 at 9, 848 So.2d at 583. The insurance policy establishes the limits of liability, and that policy is the law between the parties. Id. When we find that the provisions of the policy are clear and unambiguous, we must enforce the policy as written. LSA-C.C. art. 2046; Hill, 05-1783 at 3, 935 So.2d at 694; Peterson, 98-1712 at 4-5, 729 So.2d at 1028.
The policies at issue in this case, when read as a whole, clearly provide that the "benefits" available under each policy are limited to the amount of coverage identified on the face of each policy as the "Ultimate Amount of Insurance" or "Ultimate Funeral Benefit." Here, the face amount of each policy is $500.00, which plaintiff received and assigned to the funeral home to be applied toward the cost of her late husband's funeral. Pursuant to the clear and unambiguous terms of the policies, the defendants are entitled to summary judgment as a matter of law.
Summary judgment is particularly appropriate in this case because, contrary to the district court's conclusion, the insurance contracts, being clear and unambiguous, can be construed from the four corners of the instruments without resort to extrinsic evidence. Robinson, 01-1697 at 4, 809 So.2d at 945; Peterson, 98-1712 at 5, 729 So.2d at 1029, (when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate). Moreover, plaintiff's position throughout this entire litigation has been consistent: Mrs. Sims maintains that her interpretation of the policies is based solely upon her reading of the policies, and not upon any representations made by anyone as to the policies' content.[10] At the hearing before the district court, counsel for plaintiff specifically argued that the expectations of the parties were based on and defined by the terms of the insurance contracts. Under these circumstances, we find that there simply are no disputed issues of material fact and that defendants are entitled to summary judgment in their favor.

CONCLUSION
Our conclusion that defendants are entitled to summary judgment on the basis of the clear and unambiguous language of the insurance contracts, without regard to LSA-R.S. 22:253(A), abrogates the need to address the issue of whether 2004 La. Acts No. 689 violates the constitution. Therefore, we pretermit addressing whether 2004 La. Acts No. 689 is unconstitutional insofar as it calls for retroactive application *596 of the statute to the claims presented here. Our conclusion also abrogates the need to address the issue of whether the class was properly certified.
Accordingly, for the reasons set forth above, we reverse the judgment of the district court and hereby grant summary judgment in favor of defendants.
REVERSED and RENDERED.
KIMBALL, J., concurs in part and dissents in part and assigns reasons.
JOHNSON, J., concurs in part and dissents in part for reasons assigned by KIMBALL, J.
KNOLL, J., dissents and assigns reasons.
KIMBALL, J., concurring in part and dissenting in part.
I agree with the majority's conclusion that this case can be disposed of on non-constitutional grounds. Consequently, I concur in its decision to pretermit addressing the constitutionality of La. Act No. 689 of 2004. I dissent, however, from the majority's decision to resolve the case on non-constitutional grounds. In my view, the case should be remanded to the court of appeal for it to examine the remaining non-constitutional questions. Once this court determines appellate jurisdiction is not properly invoked, the matter should be remanded to the court of appeal for its review of the non-constitutional issues.
KNOLL, Justice, dissenting.
This case, as embodied in the majority opinion, exemplifies that many times laws are like cobwebs which may catch small flies, but let wasps and hornets break through. See Jonathan Swift, A Critical Essay on the Faculties of the Mind (paraphrasing Anacharsis, On Law and Lawyers). Under the facts before us, however, I refuse to believe that to be the case.
I agree that if the means exist to avoid reaching the issue of the constitutionality of a statute that avenue must be taken. However, I find the language of the two funeral service policies obligated Mulhearn Funeral Home, Inc. and Mulhearn Protective Insurance Company (hereafter Mulhearn) to furnish and conduct Mr. Sims's funeral and burial service for the face amount of the policies. Therefore, I find we have to reach the constitutional issue on which the trial court ruled.
Over the course of his life, Mr. Sims, by my calculations, paid premiums of $1,571.20 to Mulhearn for the two ordinary life funeral service policies. Under the provisions of the 1958 policy, Mulhearn agreed ". . . to furnish and conduct at the time of the death of the Insured . . . all funeral benefits provided." (Emphasis added). As provided in the benefits section of the policy, Mulhearn agreed that "[u]pon the death of the person insured . . . benefits in the face amount shown in the above schedule [$500.00] will be furnished, which shall include the following: . . . Casket and outside case, burial garments if requested, preparation of body, funeral coach, arrangement and transportation of flowers, conducting of funeral, furnishing information to newspapers, cemetery equipment, chairs, use of funeral home, acknowledgment cards, candelabra and prie Dieu when desired." In like vein, Provision (9) of the policy provides that if the insured changes his domicile and it becomes impractical for the authorized funeral director "to perform the funeral, the Company will pay in lieu of such funeral, 75% of the nominated funeral benefit." (Emphasis added).
The 1963 policy, denominated across the top of the contract as an "ORDINARY LIFE FUNERAL SERVICE POLICY," *597 contains similar language, describing the funeral service benefits. In uppercase letters, this policy proclaims in the middle of the cover page, "FUNERAL SERVICE TO BE FURNISHED IF INSURED IS OVER 3 YEARS OF AGE AT DATE OF DEATH." Further, under the stipulations and conditions section, the policy states, "Full Benefit  This Policy is an immediate full funeral benefit from its date except as herein otherwise provided." (Emphasis added). Similar to the 1958 policy, the 1963 policy provided for a change in domicile on the part of the insured, stating that if such relocation "made it impractical for the Company to furnish the funeral provided herein, a cash payment of 100% of the face amount of this Policy will be made in lieu of the funeral service provided herein." (Emphasis added). Notably, the 1963 policy included a provision that was absent in the 1958 policy. Under the stipulations and conditions section, the 1963 policy additionally states that "[s]hould the Company deem it impractical to furnish a funeral service in accordance with the terms of this Policy, they shall, in lieu thereof, pay the full face amount of the Policy in cash to the beneficiary named herein." (Emphasis added).
The majority, after considering the policies, concludes that "[a]n interpretation of the policies to provide for a complete funeral, at no additional expense, regardless of the amount of coverage purchased, is not reasonable, and would lead to absurd consequences." At 593. I disagree.
If, after applying the general rules of construction an ambiguity remains in an insurance contract, the ambiguous contractual provision is construed against the insurer that issued the policy and in favor of the insured. Hill v. Shelter Mut. Ins. Co., XXXX-XXXX (La.7/10/06), 935 So.2d 691. It is also an established tenet of our law that it is not the province of the courts to relieve a party of a bad bargain, no matter how harsh. Kenny v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970); Sunrise Construction and Development Corporation v. Coast Waterworks, Inc., 00-0300 (La. App 1 Cir. 6/22/01), 806 So.2d 1, 5, writ denied, 01-2577 (La.1/11/02), 807 So.2d 235; Board of Commissioners of Port of New Orleans v. Turner Marine Bulk, Inc., 629 So.2d 1278, 1282 (La.App. 4 Cir.1993), writ denied, 94-0140 (La.3/11/94), 634 So.2d 392.
In the present case, the majority contends that it would be unreasonable to expect Mulhearn to be obligated to pay the entire cost of the funeral regardless of the face amount of burial service policy. It might be correct to make such an assertion, but I hasten to point out that it would have been just as reasonable to expect Mulhearn to provide a funeral that was proportional to the face amount of the policy. My understanding of the record is that Mulhearn made no such offer to provide a funeral service as it contracted. As an ancillary finding, the majority further points out that if Mulhearn was obligated under the first policy to provide a funeral service, there would have been no need for the second policy. Again, in line with my preceding observation, I find that the procurement of the additional policy allowed Mulhearn to provide a funeral service in line with the higher costs the passage of time engendered. Moreover, I hasten to point out other reasons why Mr. Sims may have procured the second policy. Unlike the 1958 policy, the 1963 policy provided for paid-up, extended insurance, and cash surrender of the policy  items not provided in the 1958 policy and which he may have found beneficial.
Additionally, I take issue with the majority's reliance on that provision of the 1963 policy that allowed Mulhearn "[s]hould [it] deem it impractical to furnish a funeral service in accordance *598 with the terms of this Policy, they shall, in lieu thereof, pay the full face amount of the Policy in cash to the beneficiary named herein." As provided, in pertinent part, in LA. CIV.CODE ANN. art. 1770, "A suspensive condition that depends solely on the whim of the obligor makes the obligation null." The determination of what is or is not impractical rests purely on the whim of Mulhearn and is void of any independent benchmark upon which to base that decision. Accordingly, I find that provision of the 1963 policy unenforceable.
For these reasons, I dissent from the majority opinion. I would find Mulhearn obligated to provide a funeral service in accordance with its contract. Accordingly, I would reach the question of whether it was unconstitutional for 2004 La. Acts No. 689 to retroactively require that "under no circumstances shall an insurer be required to provide services or reimburse to a beneficiary at amounts greater than the stated dollar amount of the policy."
NOTES
[1] The policies at issue are variously referred to as ordinary life funeral service policies, or as industrial life insurance policies, but are more commonly referred to as burial insurance policies. The policies do provide for other benefits, such as a loss of eyesight or limbs benefit and an accidental death benefit.
[2] A prieu-dieu is a kneeling bench designed for use by a person at prayer. It is fitted with a raised shelf on which the elbows or a book may be rested. THE NEW OXFORD AMERICAN DICTIONARY 1352 (2001).
[3] Pursuant to LSA-Const. art. V, § 5(D)(1), this court has appellate jurisdiction when "a law or ordinance has been declared unconstitutional."
[4] LSA-Const. art. V, § 5(F) provides, in pertinent part, that "the supreme court has appellate jurisdiction over all issues involved in a civil action properly before it."
[5] For example, the 1963 policy, titled "ORDINARY LIFE FUNERAL SERVICE POLICY  MONTHLY," provides, in pertinent part, that the insurer "HEREBY AGREES TO FURNISH,. . . . the funeral as described below." It then describes the "FUNERAL SERVICE TO BE FURNISHED IF INSURED IS OVER 3 YEARS OF AGE AT DATE OF DEATH" in virtually the same language employed in the "Benefits" section of the 1958 policy, stating that:

Upon the death of the person insured under this Policy while in force, benefits in the face amount shown in the above schedule will be furnished, which shall include the following: Casket and outside case, burial garments if requested, preparation of body, funeral coach, arrangement and transportation of flowers, conducting of funeral, furnishing information to newspapers, cemetery equipment, chairs, use of funeral home, acknowledgment cards, candelabra and Prie Dieu when desired. These benefits do not include cemetery burial plots, or any other service not specifically enumerated. The relatives of the deceased shall have the privilege of selecting the casket and burial garments with reference to design and color according to values as provided in this Policy.
As with the 1958 policy, the Schedule which appears directly above this paragraph lists the name of the insured, age next birthday, date of issue, "Ultimate Funeral Benefit," which is designated as $500.00, and "Monthly Premium," which is indicated to be $2.60.
[6] While the 1958 policy does not contain a provision identical to that in the 1963 policy, at the time that policy was issued, LSA-R.S. 22:253 required that every funeral policy "provide for a stated cash payment which shall not be less than seventy-five percent of the value of the funeral as stated in the policy in lieu of such funeral in the event it is impossible or impractical to furnish such services as set forth in the policy," thereby supplementing the policy provisions.
[7] The dollar amount of benefits that industrial policies were authorized by law to provide has been limited by statute since 1906, when the maximum amount of benefits was $500.00. See, Acts 1906, No. 65 (currently LSA-R.S. 22:252). The statutory limitation has been increased several times over the years to the maximum of $2,500.00 in 1974. See, Acts 1974, No. 4. In 1997, the legislature amended the law to prohibit the issuance of funeral service policies after July 31, 1997. See, Acts 1997, No. 949, codified in LSA-R.S. 22:253.
[8] Under plaintiff's interpretation, by virtue of having purchased two funeral policies, Mr. Sims would be entitled to two funerals. If Mr. Sims thought he was contractually entitled to a full funeral following the purchase of the first policy, there would have been no need to purchase the second policy. By virtue of the purchase of two policies, he was apparently aware of the limitation imposed by the face amount of the policies.
[9] The interpretation of the policies advanced by plaintiff would require the insurer to pay, as regards each policy, the full price of a funeral service on the date of the insured's death. The price of Mr. Sims' funeral was $5,998.39. In 1997, when LSA-R.S. 22:253 was amended to prohibit the sale of funeral service policies, the law prohibited domestic industrial insurers from issuing on a single life a life insurance policy, including funeral benefits, in excess of the aggregate value of $2,500.0 in death benefits. LSA-R.S. 22:252(A)(1). Plaintiff's interpretation of the insurance contracts insofar as it would require payment in excess of this statutory maximum would allow the parties to circumvent the law as set forth in LSA-R.S. 22:252.
[10] We note for the sake of completeness only that the plaintiff has specifically stated in brief that "[s]he does not, however, claim, assert, or plead anywhere in her Petition that any employee of Mulhearn Protective Insurance misrepresented anything about the terms or benefits of the policies when they were first sold in 1958 or 1963." Plaintiff also stated in brief that "[t]here is no claim of misrepresentation committed by any Mulhearn Insurance employee or agent." However, plaintiff contends that there was a misrepresentation regarding the terms of the policies by Mulhearn Funeral Home employees when the policies were presented. That allegation has no validity because our interpretation of the policies is the same as that of the funeral home.