STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-980


STEVE H. CROOKS, ET UX.

VERSUS

PLACID OIL COMPANY, ET AL.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 33,805
HONORABLE ALFRED A. MANSOUR, JUDGE AD HOC

\*\*\*\*\*\*\*\*\*\*

MARC T. AMY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Marc T. Amy, and Billy Howard Ezell, Judges.

AFFIRMED.

Saunders, J., dissents and assigns written reasons.


Donald R. Wilson
Gaharan & Wilson
Post Office Box 1346
Jena, LA   71342
(318) 992-2104
COUNSEL FOR DEFENDANT/APPELLEE:
    Windham Oil Corporation

R. Joseph Wilson
Gaharan & Wilson
Post Office Box 1346
Jena, LA   71342
(318) 992-2104
COUNSEL FOR DEFENDANT/APPELLEE:
    Hunt Petroleum Corporation

**Robert G. Nida**
**Gold, Weems, Bruser, Sues & Rundell**
**Post Office Box 6118**
**Alexandria, LA   71307-6118**
**(318) 445-6471**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
**Steve H. Crooks**
**Era Lea Henderson Crooks**

**Jimmy R. Faircloth, Jr.**
**Post Office Box 12730**
**Alexandria, LA   71315-2730**
**(318) 442-9533**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
**Steve H. Crooks**
**Era Lea Henderson Crooks**

**Robert S. Rooth**
**Chaffe McCall, L.L.P.**
**1100 Poydras Street, Suite 2300**
**New Orleans, LA   70163-2300**
**(504) 585-7000**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
**Kingfisher Resources, Inc.**
**Louisiana-Hunt Petroleum Corp.**
**Hunt Petroleum Corporation**

**J. Ralph White**
**The White Law Firm**
**Post Office Box 2246**
**Oxford, MS   38655**
**(662) 281-3940**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
**Placid Oil Company**
**Petro-Hunt, LLC**

**Pamela R. Mascari**
**Kean  Miller Hawthorne D'Armond McCowan & Jarman, L.L.P.**
**Post Office Box 3513**
**Baton Rouge, LA   70821**
**(225) 387-0999**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Oil & Land Enterprises**

AMY, Judge.

The plaintiffs acquired property containing a salt water disposal well. They alleged that the defendant oil companies injected salt water into the well from source wells not anticipated by the agreement establishing the operation of the well. The plaintiffs also named as defendants the oil companies operating the source wells. The trial court granted summary judgment in favor of the defendants, finding that the plaintiffs could not establish breach of contract or recover in tort. The trial court also found that the plaintiffs' claim against a source well operator had prescribed. The plaintiffs appeal. For the following reasons, we affirm.

**Factual and Procedural Background**

At issue is a Salt Water Disposal System Agreement, Servitude and Damage Release (hereinafter "the Agreement") entered into between Emma Dee Webb Gray and Placid Oil Company on September 29, 1981. In exchange for $5,000, Mrs. Gray granted Placid the "privilege of maintaining a salt water disposal well and system" on a one-acre portion of her property surrounding the location of a pre-existing oil well. Mrs. Gray further granted a right of way across the remainder of her property "to convey salt water and other materials from *wells in the area* to the salt water injection well[.]" (Emphasis added.)

Placid began operation of the salt water disposal well in June 1982 and did so until it sold its interest to Louisiana Hunt Petroleum Corporation. Louisiana Hunt Petroleum Corporation's successor, Hunt Petroleum Corporation, continues to operate the salt water disposal well.

The plaintiffs, Steve H. Crooks and Era Lea Henderson Crooks, purchased Mrs. Gray's property, a 27 ¾ acre tract, in 1998. The plaintiffs filed suit in January 2004, and alleged that, after purchasing the property, they discovered that Placid and its

successors had injected millions of barrels of salt water originating from wells located outside of their property into the disposal well. As the plaintiffs asserted that the Agreement did not authorize the injection of salt water originating outside of the 27 ¾ acre tract, they advanced causes of action in breach of contract and tort. In addition to Placid, LHPC, and HPC, the plaintiffs named as defendants several entities that produced salt water injected into the disposal well.

Placid, LHPC, and HPC filed motions for summary judgment asserting that their operation of the well was within the terms of the Agreement as it anticipated injection of salt water from outside of the Gray/Crooks property insofar as it refers to "wells in the area." They argued that, absent this breach of contract, there could be no related claims in tort for an action such as trespass. Oil & Land Enterprises, a source well provider also filed a motion for summary judgment, alleging that it did not have a contract with the plaintiffs or their predecessor in interest therefore precluding a breach of contract claim. Oil & Land also asserted that the plaintiffs' claims against it in tort were prescribed as it had not produced fluids allegedly introduced into the well after 1999.

The trial court granted the motions for summary judgment, finding that the Agreement expressly permitted Placid and its successors to bring salt water from outside of the plaintiffs' property on to the one-acre well site.[1] The trial court further

---

[1] In denying the plaintiffs' contract claim as to Louisiana-Hunt Petroleum Corporation, Hunt Petroleum Corporation, Placid Oil Company, Petro-Hunt, L.L.C., and Oil & Land Enterprises, Inc., the trial court explained, in part:

> Plaintiffs allege that the defendants' interpretation of the phrase "in the area" is too broad, and not what was intended by the contract. The plaintiffs allege that the contract prohibits the disposal of saltwater from "non-revenue interest wells." In the alternative, the plaintiffs allege that because the phrase "in the area" is not defined in the contract, it is ambiguous.

> Ms. Gray testified by deposition in this case that at the time she signed the

2

1981 agreement, she was an experienced businesswoman who owned and operated an oilfield service business. She testified that when she saw the agreement she recognized that she was granting a servitude and she went ahead and signed it and accepted the consideration. She further testified that she believed she had her lawyer review the 1981 Agreement for her before she signed it. The well was operated consistently for at least 16 years with no complaint by Mrs. Gray, the landowner. Thus, to the original parties to the 1981 Agreement there was no misunderstanding as to the meaning of the contract.

Mr. Crooks, who at the time of his purchase of the property, was the Clerk of the 28th Judicial District Court, was familiar with title issues and understood that prior recorded agreements would affect his use of the property if he bought it. Mr. Crooks had previously worked for many years as a petroleum landman. Prior to his purchase of the land, Mr. Crooks knew that the salt water was produced in connection with oil from wells in LaSalle Parish. He also knew that salt water was produced in connection with oil from wells in LaSalle Parish. He also knew that large volumes of salt water were being reinjected into the ground rather than being trucked offsite. Before the purchase, Mr. Crooks performed a title search on the property and located the 1981 Agreement, which he reviewed and discussed with Mrs. Gray. He also learned that Hunt Petroleum Corporation was operating a community saltwater disposal well on the Well Site. Mr. Crooks went to the Conservation Office to review the public saltwater disposal records maintained by that office for the well in question. He learned that the Conservation Office had granted a permit to Hunt Petroleum Corporation to operate the saltwater disposal well as a "community" disposal well.

Mr. Crooks also knew when he bought Mrs. Gray's property that she previously had granted pipeline rights of way to permit salt water and oil to be transported across her property to a tank battery that was operated by Hunt Petroleum Corporation and was located on the property he purchased from her. Further, Mr. Crooks knew that three pipelines containing oil and salt water ran into this tank battery, since these pipelines are mentioned in a surface use agreement Mrs. Gray had granted to Placid for the use of that facility.

The title of the 1981 Agreement is indicative of the parties' intent to enter into both a saltwater disposal contract and a servitude agreement. The 1981 Agreement expressly allows Placid to dispose of salt water and to operate a saltwater disposal and injection system on the Well Site. The 1981 Agreement expressly allows Placid to bring salt water from outside the 27 ¾ acres of Mrs. Gray's property on to the one-acre Well Site. The 1981 Agreement neither restricts the number of source wells no [sic] limits the quantity of salt water that can permissibly be injected into the disposal well.

Even if the ph[r]ase "in the area" could be viewed as somehow ambiguous, this provision would have to be interpreted in light of the nature of the contract, equity, usage, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the parties. La.Civ.Code art. 2053. Jurisprudence has held that "one of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for a period of many years." *Total Minatome*, 766 So.2d at 689; *Gamble v. D.W. Jessen & Assoc.*, 509 So.2d 1041, 1043 (La.App. 3rd Cir. 1987); *Book v. Schoonmaker*, 26 So.2d 366 (La.1946). "When the true intent of the parties has been ascertained from their own actions, express or implied, oral or written, or by judicial interpretation, nothing remains to be done save

found that there was no restriction on the quantity of salt water that could be injected. Due to its findings that the plaintiffs failed to establish a breach of contract claim, the trial court determined that the plaintiffs' tort claims for unjust enrichment and trespass failed as well. The trial court also granted Oil & Land's motion for summary judgment finding that no contractual relationship between Oil & Land and the plaintiffs and that any tort claim had prescribed. The trial court dismissed the plaintiffs' claims against Placid, LHPC, HPC, Petro-Hunt, L.L.C., and Oil & Land.

The plaintiffs appeal, assigning the following as error:

1.    The trial court held that the 9/29/81 Agreement permits the injection of an unlimited amount of saltwater from drilling fields

---

enforce them as found. When thus ascertained, the intentions become an integral part of the contract to the same extent as though they had been originally expressed therein in unequivocal or unambiguous words." *Shoreline Oil Corp. v. Guy*, 189 So. 348, 352 (La.App. 2nd Cir. 1939). Where there is no issue of fact as to the past conduct and course of dealing of the parties and their predecessors over many years, the factual issue of intent in a contract may be resolved on summary judgment. See *Total Minatome, supra*.

In this matter, the 16 year course of performance of the parties demonstrates that the original grantor of the rights, Mrs. Gray, clearly contemplated the disposal activities that actually occurred. The performance and conduct of the parties clearly indicate that they never intended to limit the 1981 Agreement concerning the geographical sources of the salt water, other than from "wells in the area." The contract plainly gives Placid the right to transport salt water across Mrs. Gray's 27 ¾ acres of property. The contract did not limit this right by stating that only Placid's salt water could be transported. From 1983 to 2003 (except in 1991 and 1992 when it was not using the well for community purposes), Hunt Petroleum Corporation transported salt water from wells operated by others for injection into the Webb State SWD No. 1.

Not only did Mrs. Gray allow the well to be used for these purposes, but similarly during the first five years that the Crooks owned the property they too permitted the activities to continue. Thus, as a matter of law, even if the agreement was deemed ambiguous, the parties' course of performance demonstrates that they intended the term "in the area" to encompass the West Catahoula Lake Field and the adjacent Catahoula Lake Field. The Court, in light of the actions of the parties through the years, does not find the contract to be vague or ambiguous. The Motions for Summary Judgment are granted as the defendants on this issue.

Further, the Court finds that no contractual relationship exists between plaintiffs and Oil & Land Enterprises, Inc., and therefore the Court grants the Motion for Summary Judgment as to Oil & Land Enterprises, Inc. as to any cause of action against it for breach of contract.

4

not specified in the agreement. This was error.

2.  The trial court held that since the 9/29/81 Agreement did not restrict the source wells from which saltwater could be disposed, there was no trespass involved in the disposal of saltwater. This was error.

3.  *In dictum* the trial court held that the plaintiffs' claims against Placid Oil Company (and presumably Oil & Land Enterprises, Inc.) had prescribed. This was error.

## Discussion

*Summary Judgment*

This matter was dismissed pursuant to motions for summary judgment. Article 966(B) of the Louisiana Code of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." A trial court's grant or denial of a motion for summary judgment is reviewed de novo by an appellate court. *Schroeder v. Board of Supervisors of Louisiana State University*, 591 So.2d 342 (La.1991).

*Scope of the Agreement*

The plaintiffs question the trial court's determination that the 1981 Agreement permitted the introduction of salt water originating outside of the 27 ¾ acre tract transferred by Mrs. Gray to the plaintiffs. They point out that two wells existed on the property at the time the Agreement was executed, Webb State Unit No. 1 Well, which was abandoned and was ultimately converted into the salt water injection well at issue, and Webb State Unit No. 2 Well, which was in production until it was plugged and abandoned in 1991. The plaintiffs contend that the Agreement only permits the disposal of salt water originating from this latter well or other wells in

5

drilling units including a portion of the 27 ¾ acre tract. The plaintiffs assert that it is these revenue interest wells that the Agreement anticipated in its use of "wells in the area." and that the use of "the" immediately before "area" limits the agreement to the property otherwise referenced in the Agreement.

The Agreement provides:

> For and in consideration of the sum of FIVE THOUSAND AND NO/100 DOLLARS, cash in hand paid, the receipt and adequacy of which is hereby acknowledged, the undersigned EMMA DEE WEBB GRAY, a widow of Charles E. Gray, does by this act and these presents GRANT AND CONVEY unto PLACID OIL COMPANY, the right and privilege of maintaining a salt water disposal well and system, as hereinafter described, on the following described land, to-wit:

>> One acre of land, more or less, around the location of the oil well known as the No. 1 Webb-State, said acre being more particularly described as follows:

>> One acre of land, with well location being in the center of said acre, well location being 706 feet from North line and 418 feet from West line, NW 1/4 of NW 1/4 of Section 11, T6N, R3E, LaSalle Parish, Louisiana.

> The above described tract being hereinafter referred to as the well site.

> In addition to the uses hereinafter granted insofar as the well site is concerned, grantor hereby conveys to the grantee sufficient rights of way across grantor's property, being the fractional Section 11, T6N, R3E, LaSalle Parish, Louisiana, less tracts previously sold, being same land acquired from INEZ WEBB FRAZIER, Conveyance Book No. 82, Page No. 361, records of LaSalle Parish, Louisiana, to convey salt water and other materials *from wells in the area* to the salt water injection well, it being agreed that said rights of way will be used in such a way as to inconvenience the grantor in her use of the property as little as possible. It is further agreed that when necessary the pipes conveying said salt water will be buried below plow depth. It is also agreed that the existing road to well site may be used by grantee as needed, and improved by grantee at grantee's expense, as grantee sees fit.

> This grant shall be for a period of ten years beginning on the date of this grant, and for so long thereafter as grantee uses the property described herein without interruption of more than twelve (12) months.

6

The terms and conditions of this grant are as follows:

1.

Operator is given the use of the above described property for the purpose of constructing, operating and maintaining thereon a saltwater injection and disposal system including expressly, but not by way of limitation, the right to conduct any form of work thereon necessary or convenient to the construction, maintenance and operation of a saltwater injection and disposal system and pipelines and the full right of ingress and egress to and from the property, for men, materials and equipment which may be deemed necessary, in Operator's sole discretion, for construction, maintenance and operation of the saltwater injection and disposal system and pipelines, and transportation of any and all liquids, gases, solids, and any combination thereof.

2.

Grantor agrees to pay all taxes against the premises during the term hereof, provided, however, that the grantee shall be responsible for all taxes assessed against any improvements or equipment it places or causes to be placed on said premises.

3.

Upon termination of this agreement for any cause, grantee shall have twelve (12) months from the date of said termination to remove any improvements or equipment it has located thereon. Grantee further agrees to back fill pits and to return the premises in as near the condition as it received them as is practical under the circumstances.

4.

This consideration paid for this grant covers the ordinary use of the land for the purposes stated. Any damages caused by grantee's future operations other than the use of the land on which grantee's pipelines or appurtenances are located shall be paid to grantor at fair value.

(Emphasis added.)

Article 2045 of the Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." If the "words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046.

Furthermore, "[t]he words of a contract must be given their generally prevailing meaning." La.Civ.Code art. 2047. In the event that the contract includes words of art or technical terms, these provisions "must be given their technical meaning when the contract involves a technical matter." *Id.* Finally, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. When a contract can be interpreted by reference to its four corners alone, without consideration of extrinsic evidence, its interpretation is a matter of law and renders summary judgment appropriate. *Sims v. Mulhearn Funeral Home, Inc.*, 07-0054 (La. 5/22/07), 956 So.2d 583.

We find no error in the trial court's determination that the Agreement did not preclude Placid and its successors from injecting salt water originating outside of the 27 ¾ acre tract into the well. Simply, the Agreement does not limit the salt water to that tract. The wording of the Agreement is clear, explicit, and unambiguous in its lack of restriction on the source of the salt water to revenue interest wells and in its lack of limitation on the quantity of salt water to be introduced. Instead, the property descriptions are limited to the well site and to the entirety of the acreage for establishment of the right of way across the property "to convey salt water and other materials" to the well. No language couples "wells in the area" to the property descriptions, to any particular well, or to any existing mineral leases. We find no merit in the argument that the use of "the" before "area" limits the Agreement to property otherwise described. While that construction may be appropriate in other contracts, it is not relevant to the phrase at issue in this Agreement.

Although the Agreement is clear and explicit on its face as to whether the salt

8

water must originate on the Gray/Crooks property, we observe that, to the extent the parties offered evidence and arguments outside of the four corners of the contract, these too support the defendants' position. The operation of the well, for more than two decades, indicates that the parties had no intent to limit the source or quantify of salt water. No evidence in the record points to any other intent. Although the property was burdened by a pre-existing mineral lease, no language in the Agreement ties the disposal well to production related to that lease. Moreover, the plaintiffs lacked compelling evidence to support their position that payment for each barrel of salt water injected into the disposal well is the industry practice or the failure to do so resulted in an inequity. The Agreement instead provided consideration of an initial lump sum payment for the right to maintain the well. In short, the evidence as to industry practices was insufficient to point out genuine issues of material fact that would have precluded summary judgment.

This assignment lacks merit.

*Remaining Assignments*

Beyond the question of whether the Agreement is ambiguous, the plaintiffs' assignments relate to the use of extrinsic evidence in the interpretation of the contract, the tort claim for trespass due to the wrongful disposal of saltwater, and the trial court's observation that any claim against Oil & Land was prescribed. Each of these assignments, however, was contingent upon a preliminary determination that the Agreement was ambiguous as to the term "wells in the area." These remaining assignments are rendered moot by the above determination that the Agreement is clear and explicit on this point.

**DECREE**

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assigned to the appellants, Steve H. Crooks and Era Lea Henderson Crooks.

**AFFIRMED.**

NUMBER 07-980

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STEVE H. CROOKS, ET UX.

VERSUS

PLACID OIL COMPANY, ET AL.

**Saunders, J., dissents and assigns written reasons**.

The majority finds that the wording of the Agreement is clear, explicit, and unambiguous in its lack of restriction on the source of the salt water to revenue interest wells and in its lack of limitation on the quantity of salt water to be introduced.

I agree with the majority that the language in the contract does not restrict the amount of saltwater that can be injected into the well. I also agree with the majority that the language in the contract does not restrict the number of wells that can be a source for saltwater to be deposited into the well with the obvious limitation of the number of actual wells that can be erected "in the area." This interpretation of the clear language of the contract leads to no absurd consequences. As such, per La.Civ.Code arts. 2045 and 2046, no further interpretation as to the meaning of the provision in this regard may be made.

However, the majority also found that the provision allows Placid to bring saltwater from outside the 27¾ acres of Mrs. Gray's property on the one-acre saltwater injection well site. With this finding, I do not agree.

The determination of what the parties intended the phrase "in the area" is the seminal issue that must be decided by this court and the court below. "In the area" is

not defined in the Agreement. The contract before us refers to an "area," but it is silent to what that "area" entails.

Because we are given no guidance from the instrument as to what "in the area" might be, we should first look to La.Civ.Code 2045 arts. and 2046 to determine if there is a clear and explicit meaning of the language that does not lead to absurd consequences. I think the majority's finding that the words in the provision were clear and explicit as to the source of the saltwater and materials leads to the absurd consequence of allowing saltwater and other materials to be shipped in and injected into the well from anywhere on Earth or even beyond. Thus, I think that "in the area" is ambiguous as used in the provision. As such, I would reverse the trial court's ruling and remand the case for further proceedings.