## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-316


BOPCO, L.P.

VERSUS

CHARLES R. WARD, SR., ET AL.


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 91269-B
HONORABLE JULES D. EDWARDS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## MARC T. AMY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Marc T. Amy, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Charles R. Ward, Jr.**
**71234 Hendry Avenue**
**Covington, LA 70433**
**(985) 892-1367**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Charles R. Ward, Sr.**
    **Lenore R. Ward**

**Don R. Beard**
**Dennis, Bates & Bullen, L.L.P.**
**318 St. Charles Street**
**Baton Rouge, LA 70802**
**(225) 343-0100**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Frank A. Cormier**
    **Vincent T. Mallette**
    **James N. Reichard, Jr.**
    **W. W. Rucks, III**

**Raymond A. Beyt**
**Beyt & Beyt**
**Post Office Box 52157**
**Lafayette, LA   70505**
**(337) 233-6771**
**COUNSEL FOR DEFENDANT/APPELLANT:**
 **Donald J. Zadeck**

**Charles R. Minyard**
**Post Office Box 3642**
**Lafayette, LA   70502**
**(337) 266-2300**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
 **BOPCO, L.P.**

**AMY, Judge.**

The plaintiff is the operator of an oil well in which the defendants are interest owners. The defendants opted not to participate in the plaintiff's proposal to undertake certain workover repairs necessary for continued production, thereby forfeiting their future interest in the well. Subsequently, the plaintiff sought judgment declaring that, despite the forfeiture of the interests, the defendants will be liable for future plugging and abandonment costs pursuant to the venture's Operating Agreement. Both the plaintiff and the defendants filed motions for summary judgment on the issue of continuing obligation to the well costs. The trial court granted the plaintiff's motion and rejected that of the defendants. The defendants have appealed. We affirm.

### Factual and Procedural Background

The parties entered into an Operating Agreement in 2003 for the acquisition and operation of a Vermilion Parish oil well. The plaintiff in this matter, Bass Enterprises Production Company (hereinafter "BOPCO"), is the Operator of that well. This matter arose in 2007 when BOPCO submitted an Authority for Expenditure to the interest owners, proposing $1,256,000 in expenditures for a workover required in order to return the well to production. The defendant interest owners rejected the proposal, either failing to return the Authority for Expenditure or by expressly denying the request.

This controversy arose when BOPCO filed a petition for declaratory judgment[1] in which it asserted that the defendants had indicated that they "would not pay their share of the costs to plug and abandon the well[.]" The plaintiff therefore sought a declaration that the defendants "are obligated to pay their proportionate share of

---

[1] The petition also sought reimbursement for other operational costs BOPCO alleges was owed from the defendants per the Operating Agreement. That contractual demand is not now before the court.

plugging and abandonment costs as and when same become due at the time the same are incurred[.]" In answers and reconventional demands, the defendants denied the plaintiff's allegations and sought a declaration that they were not, in fact, responsible for future plugging and abandonment costs given their "non-consent" to the workover project. The parties ultimately filed motions for summary judgment on the issue of liability of future plugging and abandonment costs under the terms of the Operating Agreement.

Following a hearing on this limited issue, the trial court entered judgment in favor of the plaintiff, declaring that the defendants "have remained obligated for their proportionate shares of the plugging and abandonment costs of the Well, except for any additional plugging and abandonment costs or expenses caused by the additional operations in which said defendants elected not to participate." The trial court denied the defendants' cross-motions for summary judgment. The judgment was made final pursuant to La.Code Civ.P. art. 1915.

The defendants appeal, questioning the trial court's interpretation of the Operating Agreement.

## Discussion

*Summary Judgment*

An appellate court reviews a trial court's ruling on a motion for summary judgment under the de novo standard of review. *Louisiana Safety Ass'n of Timbermen- Self Insurers Fund v. Louisiana Ins. Guar. Ass'n*, 09-0023 (La. 6/26/09), 17 So.3d 350. It does so using the same criteria that governed the trial court's consideration of the motion, i.e., whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. *Id. See* La.Code Civ.P. art. 966(B).

*Contract Interpretation*

The limited question before this court focuses only on the contents of the Operating Agreement. Articles 2045 through 2057 of the Louisiana Civil Code guide the interpretation of a contract. Particularly, Article 2046 instructs that: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Additionally, insofar as we review this case on appeal, we are mindful that, when a contract can be construed from its four corners without resorting to consideration of extrinsic evidence, contractual interpretation is a matter of law. *Sims v. Mulhearn Funeral Home, Inc.*, 07-0054 (La. 5/22/07), 956 So.2d 583. *See also* La.Civ.Code art. 2046.

*Operating Agreement*

The parties here rely on different portions of the 2003 Operating Agreement now at issue in advancing their respective arguments regarding the prospective liabilities of the defendants who, under the terms of the Operating Agreement, became non-participating parties after they did not consent to the proposed workover operations. We turn to consideration of the pertinent Articles, emphasizing those portions of the Articles focused upon by the parties.

Article 10 of the Operating Agreement specifically addresses "non-consent operations" and provides that:

> 10.1 NON-CONSENT OPERATIONS. Unless agreed to by all parties hereto, the Unit Well shall not be abandoned, reworked or recompleted so long as it is producing Unitized Substances in paying quantities. Upon cessation of such production, OPERATOR shall immediately notify NON-OPERATOR. Any party hereto desiring to rework or recomplete such well or to drill another Unit Well must give the other parties hereto written notice of the proposed operation, specifying the work to be performed (with sufficient details so the other parties may properly evaluate such operation) and estimated cost thereof. Each party receiving such notice shall inform the party proposing the operation within twenty (20) days (or forty-eight (48) hours, exclusive of Saturdays and Sundays, where a rig available and suitable for the proposed operation is on location) after receipt thereof, whether or not the party receiving such notice elects to participate therein. If all parties hereto elect to participate,

3

OPERATOR shall conduct such operation at the cost and expense of the joint account under the provisions hereof. If operations are necessary at an early date to maintain any interest covered hereby, the owner thereof shall notify OPERATOR. Bona fide efforts shall be made to maintain such interest but no party hereto shall incur any liability to any other party hereto if such interest is lost by failure to conduct such operations in time to prevent such loss. *If less than all the parties hereto elect to participate (failure to reply within the period above fixed shall constitute an election not to participate) the party which proposed the operation shall notify the parties, if any, which elected to participate. Such parties must agree within five (5) days after receipt of such notice (or forty-eight (48) hours, exclusive of Saturdays and Sundays, where a rig available and suitable for the proposed operation is on location) to assume the entire risk, cost and expense of such operation in proportion to their interest therein or in any other proportion to which they agree, or such operation shall not be undertaken and all parties hereto shall be governed by this Article 10 as though such proposal had never been made.* If such parties so agree, the proposed operation shall thereupon be conducted under the provisions of this Article 10 as a non-consent operation. All parties participating in such operation shall hereinafter be referred to as participating party whether one or more. *All parties not participating in such operation shall hereinafter be referred to as non-participating party, whether one or more.*

(Emphasis added.) Thereafter, Article 10 sets forth a reimbursement schedule by which the parties participating in the proposed operation recoup the expenses associated with the expenditure for the non-consent operation. In this regard, Article 10.4 provides:

10.4 REIMBURSEMENT. In addition to the Operating Rights previously relinquished to participating party, non-participating party shall assign, effective as of first production resulting from such non-consent operation, its share of Unit Production (as set forth in Article 3) to participating party in the proportions agreed to as provided in Section 10.1. Participating party shall deduct from such share and pay or account for, or cause to be paid or accounted for, all applicable taxes, royalty, overriding royalty and other burdens (except excess burdens as referred to in Section 8.2) payable out of or measured by such share until it reverts as herein provided. Participating party shall own such share until it receives from the proceeds calculated at the well of the sale of such share, or market value thereof if such share is not sold, an amount equal to (after making the foregoing deductions) the total of the following:

(a) 100% of each such non-participating party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of any shut-in gas payments tendered by participating party to maintain Operating Rights relinquished by each such non-participating party, plus 100% of each such non-participating party's share of the cost of operating the well, including operations to improve, maintain or restore such

4

production, commencing with the first production after completion of such non-consent operation and continuing until each such non-participating party's relinquished interest reverts to it as herein provided (each non-participating party's share of such cost being that share which would have been chargeable to such party if all parties hereto had participated from the beginning of the non-consent operation), and

(b) <u>400%</u> of that portion of the costs and expenses of drilling, testing and completing (if an additional Unit Well), or reworking or recompleting (if the existing Unit Well) and of that portion of the cost of newly acquired equipment in the well to and including the wellhead connections, which would have been chargeable to each such non-participating party if all parties hereto had participated from the beginning of the non-consent operation.

During reimbursement, participating party and non-participating party shall continue to own their interest hereunder in all equipment and material in and on the Unit Well and Unit Area placed or installed prior to commencement of such non-consent operation. OPERATOR shall furnish non-participating party, each month, with a statement of all costs and expenses incurred in operating hereunder during the preceding month, the quantity of Unitized Substances produced during the preceding month and, based on information furnished by participating party, proceeds realized from the sale thereof.

After the participating party's receipt of the above sums, the non-participating party's operating rights are returned pursuant to Article 10.5, which provides:

10.5 REVERSION. Upon receipt of the above provided amounts, all Operating Rights owned and relinquished by non-participating party shall automatically revert to it, with no written assignment being required unless requested. Participating party shall reassign to non-participating party, effective as of the date of such receipt, such non-participating party's right to share in Unit Production and an equivalent interest in all equipment and material placed or installed by participating party in and on the Unit Well or additional Unit Well and Unit Area during such non-consent operation.

In the event that only partial reimbursement is possible, Article 10.6 further instructs that:

10.6 PARTIAL REIMBURSEMENT. If production of Unitized Substances in paying quantities ceases before participating party receives the above provided amounts and the well is not restored to production by said party, participating party shall give notice of its intent to plug such well. *If no new joint account or non-consent operation is proposed and undertaken in such well, in the manner provided in Section 10.1, participating party shall plug and abandon such well at its sole risk, cost and expense, subject to the rights of well-site owner set forth in Article 18 (regarding abandonment).* Upon completion of plugging operations or the acceptance of the tendered well for

5

another operation, as the case may be, all Operating Rights owned and relinquished by non-participating party shall automatically revert to it, with no written assignment being required unless requested, and participating party shall reassign to non-participating party such non-participating party's right to share in Unit Production.  Participating party shall be entitled to the salvage value of any equipment and material it placed in or on the Unit Well, additional Unit Well or Unit Area; provided, however, if such equipment and material has a salvage value in excess of the unrecovered amounts to which it was entitled from non-participating party's share of Unit Production, such excess shall be credited to the joint account.

(Emphasis added.)

Notwithstanding this provision regarding the plugging and abandoning costs in the event of partial reimbursement, Article 21.7 provides that:

*If any provision contained in this Article 21.7 is inconsistent with any portion of the printed form of this Operating Agreement, the provisions in this Article 21.7 shall govern and control.*

. . . .

A. <u>EARNING WELLS.</u>  If the additional operations proposed pursuant to Article 10 are necessary to retain leasehold interests, any party who elects not to participate in such additional operations shall release, relinquish and quitclaim to the parties who participate therein all the rights, titles and interests of such Non-Consenting party in and to the interests which would be retained by such operations.  For purposes of this Agreement, operations are considered necessary to retain leasehold interests if those interests would be forfeited within 120 days of the commencement of said operations.

. . . .

D.  <u>CERTAIN PLUGGING AND ABANDONMENT COSTS.</u>  *If pursuant to Article 10 hereto*, less than all of the parties elect to participate in a proposed reworking, or recompletion operation, and if such operation does not result in the production of hydrocarbons in commercial quantities, or results in a completion that ceases to produce in commercial quantities prior to the time at which the consenting parties are fully reimbursed as provided in Article 10, then, notwithstanding the printed provisions of this Agreement, the party or parties who elected not to participate in such reworking, or recompletion operation shall nevertheless be responsible for their proportionate part (Exhibit "A" percentage after casing point) of the cost to plug and abandon such well, and salvage the equipment therefrom, except for the additional plugging and abandonment of salvage costs that are caused by the non-consent reworking, recompletion operation; the consenting parties shall be solely responsible for such additional costs.

(Emphasis added.)

The plaintiff argues that Article 21.7(D) is controlling in this scenario and that it dictates that the defendants, as non-participating parties, will "nevertheless be responsible for their proportionate part of the cost to plug and abandon such well . . . except for the additional plugging and abandonment of salvage costs that are caused by the non-consent reworking, recompletion operation[.]" However, the defendants reject the assertion that Paragraph (D) is applicable and argue that this case is not covered by the contingencies of Article 10.

Rather, the defendants assert that the Operating Agreement provides for their release from future plugging and abandonment costs given the wording of Article 21.7(A). Specifically, the defendants rely on Paragraph (A)'s statement that: "If the additional operations proposed pursuant to Article 10 are necessary to retain leasehold interests,[2] any party who elects not to participate in such additional operations shall release, relinquish and quitclaim to the parties who participate therein all the rights, titles and interests of such Non-Consenting party in and to the interests which would be retained by such operations." The defendants assert in their brief that, given that they did not participate in the workover and that the operations were necessary for the retention of the leasehold interests, Article 21.7(A) indicates that they "now have no interest in the well, nor any liability in connection therewith."

After review of the Operating Agreement in light of the interpretation tools of Civil Code Articles 2045 through 2057, we find no merit in either party's reliance on the respective provisions they contend expressly control this situation. Article 21.7(D), relied upon by the plaintiff, does, in fact, expressly provide that non-participating parties remain liable for plugging and abandonment costs. However, by its express phraseology, that provision is contingent upon Paragraph 10.

_____

[2] It is uncontested that the operations at issue were necessary to retain the leasehold interests.

7

While Article 21.7(A), relied upon by the defendants, does, in fact, indicate that non-participating parties will release, relinquish and quitclaim all "rights, titles and interests of such Non-Consenting party in and to the interests which would be retained by such operations," this provision only relates to rights, titles and interests. As recognized by the trial court, it does not relieve them of their *obligations* otherwise applicable.

Instead, we conclude that the Operating Agreement does not expressly address the instant situation presented by the parties. Neither have the parties framed their arguments and their submissions to the court in light of La.Civ.Code art. 2054.[3] Rather, we are mindful that: "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. In this instance, the parties entered into the Operating Agreement, which very clearly provided for non-participating parties to divest themselves *of their future interests and related revenues.* However, only in Article 21.7(D) does the contract provide for a release of the plugging and abandonment costs and it does so for an occurrence not now present. Instead, the Operating Agreement generally accounts for the defendants' continued involvement, designating them, in fact, as non-participating parties, and anticipating the possible reversion of their interests. The defendants do not show by which Article they can no longer be considered a "party"[4] to the Operating Agreement, at least by some

---

[3] Louisiana Civil Code Article 2054 provides:

> When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

[4] We note, as illustration, that Article 20, which pertains to the term of the Operating Agreement, provides that:

> Unless terminated earlier by consent of all parties hereto, this agreement shall remain in force during the period that the Unit Well is producing (or capable of

8

description. Accordingly, we find no error in the trial court's judgment reflecting that the defendants "remained obligated for their proportionate shares of the plugging and abandonment costs of the Well, except for any additional plugging and abandonment costs or expenses caused by the additional operations in which said defendants elected not to participate."

We leave the trial court's judgment undisturbed.

## DECREE

For the foregoing reasons, the summary judgment entered by the trial court is affirmed. All costs of this appeal are assessed to the appellants-defendants.

**AFFIRMED.**

---

producing) Unitized Substances from the Unitized Sand, but shall terminate as to the right of any party hereto to operate the Unit Area, under the provisions hereof, for the exploration, development or production of Unitized Substances from the Unitized Sand at the end of a period of ninety (90) days during which the Unit Well is incapable of producing Unitized Substances from the Unitized Sand or during which a joint account or non-consent operation has not been commenced in an effort to restore Unit Production; provided, however, the applicable provisions of this agreement shall remain in force as long thereafter as necessary until all equipment and material in and on the Unit Well and on the Unit Area have been salvaged and disposed of and a final settlement has been made between the parties hereto, subject to the rights of well-site owner, as provided in Article 18, and the continuing rights of the parties hereto in the event of subsequent unitization as provided in Section 18.4.