STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2020 CA 0519

--*CONSOLIDATED WITH*--

2020 CA 0520

DIANE MCKERNAN

VERSUS

ABC INSURANCE COMPANY, AIG PROPERTY CASUALTY
COMPANY, BRAD BOURG, [AND] BOURG INSURANCE
AGENCY, INC.

JUDGMENT RENDERED: __APR 1 6 2021__

* * * * * * *

Appealed from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge • State of Louisiana
Docket Number 658181 • Section 23

The Honorable William A. Morvant, Judge Presiding

* * * * * * *

John R. Whaley
Benjamin H. Dampf
Baton Rouge, Louisiana

COUNSEL FOR APPELLANT
PLAINTIFF—Diane McKernan

Heather S. Duplantis
Kate B. Mire
Baton Rouge, Louisiana
  *and*
W. Ransom Pipes
Blaine T. Aydell
Baton Rouge, Louisiana

COUNSEL FOR APPELLEES
DEFENDANTS—Brad Bourg and
Bourg Insurance Agency, Inc.

Mark L. Clark
Houston, Texas

COUNSEL FOR APPELLEE
DEFENDANT—AIG Property
Casualty Company

Robert I. Siegel
Alistair M. Ward
New Orleans, Louisiana

COUNSEL FOR APPELLEE
DEFENDANT—QBE Specialty
Insurance Company

* * * * * * *

BEFORE: WHIPPLE, C.J., WELCH, AND CHUTZ, JJ.

**WELCH, J.**

After the plaintiff, Diane McKernan, sustained damage to her home due to the historic flooding in Louisiana in August 2016, she sued her homeowner's insurer, alleging it failed to pay out the maximum amount of damages for flooding owed under her homeowner's policy. McKernan also sued her insurance agent, alleging professional malpractice and negligent misrepresentation claims. In this consolidated matter, McKernan appeals the trial court's November 4, 2019 judgment granting a motion for partial summary judgment in favor of her insurer, finding that it owed no further amounts under her homeowner's policy for flood damage. She also appeals the trial court's November 18, 2019 judgment that sustained a peremptory exception raising an objection of peremption and granted an alternative motion for partial summary judgment in favor of her insurance agent, dismissing her professional malpractice and negligent misrepresentation claims against her agent, with prejudice. For the following reasons, we affirm the portion of the trial court's November 4, 2019 judgment granting the insurer's motion for partial summary judgment; reverse the portion of the trial court's November 18, 2019 judgment sustaining the objection of peremption and otherwise affirm; and remand.

## FACTS AND PROCEDURAL HISTORY

McKernan built her residence, located at 18722 Harbour Avenue in Baton Rouge, in 1990. From 1990 until 2008, McKernan purchased residential homeowner's insurance through State Farm Insurance Company and State Farm agent, Bill Lemoine. During that same period, McKernan obtained flood insurance through the National Flood Insurance Program ("NFIP"),[1] with flood coverage

---

[1] Congress enacted the National Flood Insurance Act in 1968, under which the Director of the Federal Emergency Management Agency is authorized to establish and carry out the NFIP, enabling persons to purchase flood insurance in flood-prone areas. See 42 U.S.C. § 4011, et seq.

2

limits of $250,000 structures/$100,000 contents. McKernan did not obtain any additional flood coverage.

In 2008, McKernan decided to switch her homeowner's insurance agency from State Farm to Bourg Insurance Agency, Inc. and agent Brad Bourg (collectively, "Bourg").[2] After speaking by phone, McKernan met in-person with Bourg in October 2008, where he presented her with two homeowner's insurance policy proposals—one from Safeco Insurance Company and one from the defendant, AIG Property Casualty Company ("AIG"). McKernan purchased the AIG residential homeowner's insurance policy (the "AIG policy") from Bourg, AIG Policy No. PCG 0002945645, effective from December 1, 2008 to December 1, 2009. The AIG policy excluded coverage for loss caused by flooding, but contained an exception for flood coverage pursuant to a flood endorsement attached to and incorporated into the AIG policy, "PCHO-FLD (09/06)."[3]

The flood endorsement set forth that coverage for loss caused by flooding is determined upon the home's flood zone designation in one of two zones. The first zone provides the broadest available flood coverage and applies to homes designated as Flood zone B, C, or X and that are eligible for the Preferred Risk Program of the NFIP. The limits of the first zone flood coverage are $250,000 structures/$100,000 contents/$250,000 additional living expenses. At the time her 2008 policy issued, McKernan's residence was designated as Flood zone B, C, or X, and she was eligible for an NFIP policy; however, she did not purchase an NFIP policy.

_____

[2] McKernan made the switch in her homeowner's insurance coverage because State Farm had added a two percent hurricane deductible to her former homeowner's policy, which caused her to pay in excess of $20,000 to satisfy her deductible in connection to a claim related to Hurricane Gustav. McKernan "no longer wanted...250/100" limits on her flood coverage; she "wanted a full policy."

[3] McKernan's AIG homeowner's insurance policy also provided homeowner's coverage for two other residences; but notably, the AIG policy did not provide flood coverage for those other two residences.

The second zone provides flood coverage for homes designated in a Special Flood Hazard Area, Flood zone D, or designated in a B, C, or X flood zone but that are not eligible for the Preferred Risk Program of the NFIP. The second zone provides flood coverage with limits of $250,000 structures/$100,000 contents/$250,000 additional living expenses, like the first zone. However, second zone coverage is "excess" coverage or "difference in conditions" ("DIC") coverage.[4]

McKernan testified that she knew from her October 2008 meeting with Bourg that her flood coverage limits under the AIG policy were $250,000 structures/$100,000 contents/$250,000 additional living expenses, and that she no longer had a two percent hurricane deductible. McKernan did not obtain any additional flood coverage through the NFIP.

McKernan renewed the AIG policy every year until 2016, when her residence flooded on August 14, 2016. McKernan timely received copies of every AIG policy covering her property from 2008 to 2016.

When McKernan renewed her AIG policy in 2013, however, the policy contained a change in her home's flood zone designation.[5] The flood zone designation on her residence changed *from* Flood zone B, C, or X *to* Flood zone A or V. Thus, the policy in effect at the time McKernan's residence flooded on August 14, 2016, indicated that her residence was located in Flood zone A or V. The policy further indicated that Flood zone A or V is defined as a "Special Flood

---

[4] The flood coverage under the AIG policy is in excess of any coverage pursuant to an NFIP policy, *i.e.*, if the home is ineligible for an NFIP policy, or if there is no such policy in effect, then AIG only pays for the amount of loss in excess of the maximum limits that can be insured under an NFIP policy. If an NFIP policy is in effect, but flood coverage under the AIG policy is higher than the NFIP policy, AIG pays the difference between the policy limits.

[5] Under the policy in effect from December 1, 2013 to December 1, 2014, McKernan's flood zone designation changed from Flood zone B, C, or X to Flood zone A or V, due to a technical change in the residence's address.

Hazard Area."[6] When McKernan made a claim under her AIG policy, AIG informed her that based upon her residence's flood zone designation under the AIG policy, her home was located within the second zone of coverage, and she was covered for loss caused by flooding with limits of $250,000 structures/$100,000 contents/$250,000 additional living expenses. However, her coverage was in excess of any NFIP policy, or in the DIC between an NFIP policy and her AIG policy.

AIG admitted that while its practice is to send notice to its insureds when there is a change in coverage at the time a policy is renewed, AIG did not provide notice to McKernan nor to Bourg in 2013 that her home's flood zone designation had changed, although AIG did deliver McKernan a copy of her 2013-2014 policy containing the change. Due to AIG's failure to send notice to McKernan that her flood zone designation and flood coverage had changed, AIG agreed to reform the policy and provide McKernan flood coverage under the 2015-2016 policy as if her home was located in the first zone and provide her flood coverage with limits of $250,000 structures/$100,000 contents/$250,000 additional living expense. Accordingly, AIG paid Ms. McKernan $250,000 for flood damage to her structures and $100,000 for flood damage to her contents. In the year following the flood, AIG paid Ms. McKernan a total of $162,000 in additional living expenses. However, McKernan alleged that based on AIG's own estimation, she suffered flood damages of over $1,674,895.18.[7]

---

[6] The flood endorsement provides:

> **Special Flood Hazard Area (SFHA)** means an area having special **flood**, or **mudflow**, and/or **flood** related erosion hazards, and shown on a **Flood** Hazard Boundary Map or **Flood** Insurance Rate Map as Zone A, AO, A1-A30, AE, A99, AH, AR, AR/A, AR/AE, AR/AH, AR/AO, AR/A1-A30, V1-V30, VE, or V.

[7] The total estimated damages included $1,071,465.71 in dwelling damages; $70,000 in pool house damages; and $533,429.47 in loss of contents.

McKernan filed a petition for damages against AIG, Bourg, and QBE Specialty Insurance Company ("QBE"), Bourg's professional liability insurer.[8] McKernan alleged that AIG was negligent for materially changing the flood coverage provided in her homeowner's insurance policy to "excess" or "DIC" coverage and failing to notify her of the change. McKernan also alleged a breach of contract, arguing that AIG breached the terms of her homeowner's insurance by misrepresenting pertinent policy provisions, including the purported flood coverage limits; refusing to make payment due; and not tendering payment in a timely fashion. McKernan further alleged that AIG breached its duties of good faith and fair dealing, as set forth in La. R.S. 22:1892 and La. R.S. 22:1973, by failing to pay her claim within thirty days after receiving satisfactory proof of loss and arbitrarily, capriciously, and without probable cause failing to pay the amount of her claim due within sixty days after receiving satisfactory proof of the loss.[9]

McKernan asserted a professional malpractice claim against Bourg, alleging that he failed to procure McKernan's desired insurance coverage and failed to procure flood coverage underlying the excess/DIC flood coverage under the AIG policy. McKernan also asserted a negligent misrepresentation claim, asserting that Bourg misled her into believing she had flood coverage when she did not, based on an October 6, 2015 email exchange between Bourg and McKernan's assistant.[10] McKernan further alleged that QBE provided professional liability insurance to Bourg, which covered his alleged negligent acts, errors, and omissions.

---

[8] McKernan filed a first amending petition for damages, which is identical to her original petition, except that her first amending petition substitutes "QBE" in the place of "ABC Insurance Company."

[9] McKernan raised her breach of contract claims and breach of good faith and fair dealing claims against AIG in her second supplemental and amending petition for damages.

[10] McKernan averred that Brad Bourg acted in the course and scope of his employment with Bourg Insurance Agency, Inc. at all pertinent times, and that the agency is vicariously liable for Brad Bourg's acts.

6

McKernan further alleged that the actions and inactions on behalf of AIG and Bourg, regarding deficiencies in what she believed to be her insurance coverage and flood zone designation under the AIG policy, constituted silence or inaction resulting in fraud under La. C.C. art. 1953, thereby nullifying any peremptive period set forth in La. R.S. 9:5606, the insurance agent malpractice statute. Alternatively, she alleged that these actions constituted a continuing tort and/or each successive renewal and payment was payment of a thing not owed.

McKernan filed a motion for partial summary judgment regarding her flood coverage under the AIG policy, arguing that she was entitled to a judgment finding that the AIG policy provided her coverage for her losses up to the limits listed on the policy's declarations page: $2,404,422 dwelling/$1,476,159 contents. McKernan alleged that AIG had a duty to notify her of the material changes it made to her homeowner's insurance policy in 2013—that the flood zone designation on her residence changed *from* Flood zone B, C, or X *to* Flood zone A or V. McKernan argued that AIG admitted that it failed to notify her of the material change to her policy, which she contended precluded AIG from relying on an "undisclosed" policy limitation. She argued that AIG "unilaterally" applied a different provision of the policy not in effect on the date of loss. McKernan contended that because the "undisclosed" policy limitation is ineffectual and AIG's unilateral reformation of her policy is unlawful, McKernan is entitled to judgment decreeing that the AIG policy provides coverage for her loses due to flooding up to the limits listed on the policy's declaration page—*i.e.*, $2,404,422 dwelling/$1,476,159 contents.

AIG opposed McKernan's motion for partial summary judgment[11] and filed a cross-motion for partial summary judgment, arguing that it was entitled to a judgment finding that the maximum available flood limits under the AIG policy

_____

[11] McKernan filed a reply memorandum to AIG's opposition to her motion for partial summary judgment.

issued to McKernan are $250,000 structures/$100,000 contents/$250,000 additional living expenses. AIG contended that McKernan received all policies and that maximum flood coverage limits are clearly set forth in the policies issued to McKernan.[12]

Bourg filed a peremptory exception raising the objection of peremption, arguing that McKernan's insurance agent professional malpractice claims against him are perempted under La. R.S. 9:5606, which mandates that any action against an insurance agent must be brought within one year from the date the alleged wrongful act, error, or omission was discovered or should have been discovered; and in all other cases, no later than three years after the date of the alleged wrongful act, error, or omission. Bourg alleged that McKernan first received her policy in December 2008, and therefore, had constructive knowledge of her flood coverage limits well over a year before May 24, 2017, the date she filed suit. As such, Bourg argued that all of McKernan's claims are perempted under the statute's one-year period. Furthermore, Bourg contended that all of McKernan's claims, with the exception of a negligent misrepresentation claim (based on an October 6, 2015 email exchange between Bourg and McKernan's assistant) are also perempted under the statute's three-year peremptive period because Bourg's alleged wrongful acts and omissions occurred more than three years before McKernan filed suit.

Bourg also filed an alternative motion for partial summary judgment on McKernan's negligent misrepresentation claim based on the October 6, 2015 email exchange, averring that McKernan could not establish two essential elements of that claim—that Bourg provided incorrect or misleading information in the October 6, 2015 emails, and justifiable reliance given that the email makes no reference to flood coverage limits and because the flood coverage limits are clearly

[12] McKernan opposed AIG's cross-motion for partial summary judgment. AIG filed a reply memorandum to McKernan's opposition.

8

set forth in the policy's flood endorsement. McKernan opposed Bourg's peremption objection and alternative motion for partial summary judgment.[13]

Following a hearing on the aforementioned motions and exception,[14] the trial court granted AIG's motion for partial summary judgment and denied McKernan's motion for partial summary judgment. The trial court signed a judgment in accordance with its ruling on November 4, 2019, certifying the judgment as final in accordance with La. C.C.P. art. 1915(B). The trial court sustained Bourg's objection of peremption and granted Bourg's alternative motion for partial summary judgment, dismissing all of McKernan's claims against Bourg, with prejudice. The trial court signed a judgment in accordance with its ruling on November 18, 2019.

McKernan devolutively appeals the November 4, 2019 judgment, as well as the November 18, 2019 judgment. On appeal, McKernan challenges the trial court's judgments granting AIG's motion for partial summary judgment; sustaining Bourg's peremption objection; and granting Bourg's alternative motion for partial summary judgment.[15] On motion of McKernan, this court consolidated her appeals.[16]

---

[13] Bourg filed a reply memorandum to McKernan's opposition to his peremption objection and alternative motion for partial summary judgment.

[14] QBE and McKernan filed cross-motions for summary judgment on QBE's professional malpractice coverage of Bourg. Following a hearing, the trial court denied both of those motions and signed a judgment in accordance with its ruling on November 18, 2019. McKernan did not appeal that judgment, nor are those cross-motions at issue in this appeal.

[15] On appeal, McKernan does not challenge the portion of the trial court's November 4, 2019 judgment that denied her motion for partial summary judgment regarding her flood coverage limits under the AIG policy.

[16] See **McKernan v. ABC Ins. Co.**, 2020-0519, 2020-0520 (La. App. 1st Cir. 9/23/20) (unpublished action).

## AIG'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## REGARDING FLOOD INSURANCE COVERAGE

In her first two assignments of error challenging the trial court's November 4, 2019 judgment, McKernan contends that the trial court erred in granting AIG's motion for partial summary judgment on two bases. First, McKernan argues that the trial court held that AIG could reform her homeowner's insurance policy "to its unilateral advantage and enforce a policy exclusion or limitation that McKernan was not made aware of and that was not in effect at the time of the loss." Second, McKernan argues that the trial court ignored and failed to address Louisiana law, which holds that "any ambiguous contractual provision is to be construed against the insurer who issued the policy and in favor of coverage for the insured."

A summary judgment may grant less than all of the relief prayed for by the respective parties; however, a partial summary judgment must grant at least some of the relief prayed for. See La. C.C.P. art. 966(A); La. C.C.P. art. 1915(A)(3); **State v. Exxon Corp.**, 95-2370 (La. App. 1st Cir. 6/28/96), 676 So. 2d 788, 789. A motion for partial summary judgment may not be used merely to decide an issue or strike down a theory of the case, without granting or denying any part of the relief claimed by any party. See **State v. Exxon Corp.**, 676 So. 2d at 789. See also **Coleman v. Robicheaux Air Boats, Inc.**, 94-2139 (La. App. 1st Cir. 6/23/95), 658 So. 2d 807, 810. The relief prayed for means any relief sought by the defendant as a defendant, more often, dismissal of the plaintiff's suit in whole or in part, with prejudice. **Beard v. Assumption Parish Police Jury**, 413 So. 2d 923, 925 (La. App. 1st Cir.), writ denied, 420 So. 2d 444 (La. 1982). The trial court may grant a motion for partial summary judgment in favor of a defendant dismissing a part of a plaintiff's case where: (1) it reduces the issues to be decided at trial; (2) it grants some part of the relief prayed for by the defendant; and (3) where plaintiff has asserted two or more separate causes of action involving different forms of relief.

**Coleman**, 658 So. 2d at 811. The judgment at issue here meets the above criteria: it decided the flood coverage limits and reduced the issues to be decided at trial; it granted some of the relief prayed for by AIG; and McKernan has asserted two or more separate causes of action involving different forms of relief, including breach of contract, negligence, professional malpractice, and negligent misrepresentation.

Whether an insurance policy, as a matter of law, provides or precludes coverage is a dispute that can be properly resolved within the framework of a motion for summary judgment. **George S. May Int'l Co. v. Arrowpoint Capital Corp.**, 2011-1865 (La. App. 1st Cir. 8/10/12), 97 So. 3d 1167, 1171. In seeking a declaration of coverage under an insurance policy, Louisiana law places the burden on the plaintiff to establish every fact essential to recovery and to establish that the claim falls within the policy coverage. **George S. May Int'l Co.**, 97 So. 3d at 1171. Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. **George S. May Int'l Co.**, 97 So. 3d at 1171.

After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). In reviewing a trial court's ruling on a motion for summary judgment, appellate courts review evidence *de novo* using the same criteria that govern the trial court's determination of whether summary judgment is appropriate. **Georgia-Pacific Consumer Operations, LLC v. City of Baton Rouge**, 2017-1553, 2017-1554 (La. App. 1st Cir. 7/18/18), 255 So. 3d 16, 22, writ denied, 2018-1397 (La. 12/3/18), 257 So. 3d 194.

The Code of Civil Procedure places the initial burden of proof on the party filing the motion for summary judgment. La. C.C.P. art. 966(D)(1). If the mover will not bear the burden of proof at trial on the issue raised in the motion for summary judgment, the mover is not required to negate all of the essential elements of the adverse party's claim, action, or defense. La. C.C.P. art. 966(D)(1). See also **Babin v. Winn-Dixie Louisiana, Inc.**, 2000-0078 (La. 6/30/00), 764 So. 2d 37, 39. However, the mover must demonstrate the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. La. C.C.P. art. 966(D)(1). See also La. C.C.P. art. 966, Comments--2015, Comment (j). The mover may meet this burden by filing supporting documentary evidence consisting of pleadings, a memorandum, affidavits, depositions, answers to interrogatories, certified medical records, stipulations, and admissions with the motion for summary judgment. See La. C.C.P. art. 966(A)(4). The mover's supporting documentary evidence must be sufficient to prove the essential facts necessary to carry the mover's burden. **Jenkins v. Hernandez**, 2019-0874 (La. App. 1st Cir. 6/3/20), 305 So. 3d 365, 370-71, writ denied, 2020-00835 (La. 10/20/20), 303 So. 3d 315. Thus, in deciding a motion for summary judgment, it must first be determined whether the supporting documents presented by the mover are sufficient to resolve all material fact issues. If not, summary judgment must be denied. **Crockerham v. Louisiana Med. Mut. Ins. Co.**, 2017-1590 (La. App. 1st Cir. 6/21/18), 255 So. 3d 604, 608.

Once the motion for summary judgment has been made and properly supported, the burden shifts to the non-moving party to produce factual support, through the use of proper documentary evidence attached to its opposition, which establishes the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. C.C.P. art. 966(D). If the non-moving party fails to produce sufficient factual support in its opposition which proves the

12

existence of a genuine issue of material fact, La. C.C.P. art. 966(D)(1) mandates the granting of the motion for summary judgment. **Babin**, 764 So. 2d at 40; **Jenkins**, 305 So. 3d at 371.

In ruling on a motion for summary judgment, the trial court's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. **Janney v. Pearce**, 2009-2103 (La. App. 1st Cir. 5/7/10), 40 So. 3d 285, 289, writ denied, 2010-1356 (La. 9/24/10), 45 So. 3d 1078. Simply showing the presence of disputed facts is insufficient if there is no legal issue presented by those contested facts. See **Franklin Credit Mgmt. Corp. v. Gray**, 2007-1433 (La. App. 4th Cir. 1/14/09), 2 So. 3d 598, 603, writ denied, 2009-0476 (La. 4/17/09), 6 So. 3d 795.

A "genuine" issue is a triable issue, which means that an issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. A fact is "material" when its existence or nonexistence may be essential to a plaintiff's cause of action under the applicable theory of recovery. **Kasem v. State Farm Fire & Cas. Co.**, 2016-0217 (La. App. 1st Cir. 2/10/17), 212 So. 3d 6, 13. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. **Georgia-Pacific Consumer Operations, LLC**, 255 So. 3d at 22.

As the Supreme Court recognized in **Sims v. Mulhearn Funeral Home, Inc.**, 2007-0054 (La. 5/22/07), 956 So. 2d 583, 588, certain elementary legal principles apply in analyzing an insurance policy. First and foremost is the rule that an insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. **Sims**, 956 So. 2d at 588-89. According to those rules, the responsibility of the

13

judiciary in interpreting insurance contracts is to determine the parties' common intent; this analysis is begun by examining the words of the insurance contract. **Sims**, 956 So. 2d at 589. When the words of an insurance contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent, and courts must enforce the contract as written. **Sims**, 956 So. 2d at 589. The determination of whether a contract is clear or ambiguous is a question of law. **Sims**, 956 So. 2d at 590.

Any ambiguity in an insurance policy is construed against the insurer. See La. C.C. art. 2056; **Louisiana Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London**, 616 So. 2d 1250, 1252 (La. 1993). Policy exclusions must be clearly stated. See La. C.C. art. 2057; **Louisiana Maint. Servs., Inc.**, 616 So. 2d at 1252. Policy ambiguities are construed in favor of coverage. **Louisiana Maint. Servs., Inc.**, 616 So. 2d at 1252. Any ambiguity in an insurance policy's exclusions is construed to afford coverage, and the insurer has the burden of proving that a loss comes within a policy exclusion. **Louisiana Maint. Servs., Inc.**, 616 So. 2d at 1252.

Louisiana Revised Statutes 22:867 (formerly, La. R.S. 22:628),[17] the "entire contract policy" statute, provides, in pertinent part:

> A. No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance. ...

> B. The provisions of this Section shall apply where a policy or other written evidence of insurance is coupled by specific reference with another policy or written evidence of insurance in existence as of the effective date or issued thereafter.

---

[17] Louisiana Revised Statutes 22:867 was renumbered from La. R.S. 22:628 by 2008 La. Acts No. 415, §1 (eff. Jan. 1, 2009).

14

C. Any written agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be deemed to be physically made a part of a policy or other written evidence of insurance, within the meaning of this Section, whenever such written agreement makes reference to such policy or evidence of insurance and is sent to the holder of such policy or evidence of insurance by United States mail, postage prepaid, at such holder's last known address as shown on such policy or evidence of insurance, by electronic transaction in accordance with the Louisiana Uniform Electronic Transactions Act, R.S. 9:2601 et seq., or is personally delivered to such holder.

As shown above, La. R.S. 22:867(A) mandates written insurance contracts. Additionally, La. R.S. 22:873 (formerly, La. R.S. 22:634) provides that every policy of insurance shall be delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance. Notice of any exclusionary provisions is essential because the insured will otherwise assume the desired coverage exists, so exclusions must be clearly communicated to the insured. **Naquin v. Fortson**, 99-2984 (La. App. 1st Cir. 12/22/00), 774 So. 2d 1277, 1279.

Furthermore, La. R.S. 22:867 imposes a duty on the insurer to inform the insured of changes in the terms of the policy. See **Roy v. Audubon Ins. Co.**, 652 So. 2d 995, 997 (La. App. 1st Cir. 1993). Louisiana Revised Statutes 22:867 mandates that if a change in coverage is made by the insurer, it must attach to or incorporate the change in the policy and notify the insured with reference to the policy. See **Citgo Petroleum Corp. v. Yeargin, Inc.**, 95-1574 (La. App. 3rd Cir. 2/19/97), 690 So. 2d 154, 163, writs denied, 97-1223, 97-1245 (La. 9/19/97), 701 So. 2d 169, 170.

The object of the statute is to assure full notification to the insured of all relevant provisions of his insurance contract. See **Spain v. Travelers Ins. Co.**, 332 So. 2d 827, 833 (La. 1976). Its intent is to protect the policyholder, *i.e.*, the party that paid the premium, from the insurer's fraud or deception in changing the

policy terms without notifying the policyholder. **Lindsey v. Colonial Lloyd's Ins. Co.,** 595 So. 2d 606, 611 (La. 1992).

Here, AIG's evidence shows that McKernan purchased a homeowner's insurance policy from AIG, Policy No. PCG 0002945645, with effective policy dates of December 1, 2008 to December 1, 2009. The AIG policy excluded coverage for loss caused by flooding, but contained an exception for flood coverage pursuant to a flood endorsement attached to and incorporated into the AIG policy. The flood endorsement, "PCHO-FLD (09/06)," provides, in pertinent part:

> **Flood**
>
> We will pay for physical loss or damage to your **house, contents** or **other permanent structures** including debris removal caused directly by **flood** unless an exclusion applies.
>
> The Flood Insurance Rate Map (FIRM) in place as of the effective date of the policy or renewal term determines the amount we will pay for a covered loss.

The flood endorsement provided for coverage as follows:

> **Payment of a Loss:**
>
> For your listed **residence** located in a designated B, C or X flood zone eligible for the Preferred Risk Program of the **NFIP**:
>
> 1. We will pay up to the lesser of the coverage limit shown on your Declarations Page or $250,000 for **property damage** to your **house** and **other permanent structures.** These payments do not increase the amount of your coverage.
>
> 2. We will pay up to the lesser of the coverage limit shown on your Declarations Page or $100,000 for **property damage** to your **contents** located at the covered **residence.** These payments do not increase the amount of your coverage.
>
> 3. We will pay up to $250,000 for Additional Living Expenses....
>
> &#42;&#42;&#42;

16

> For your listed residence located in a designated **Special Flood Hazard Area**, flood zone D, or a B, C or X flood zone not eligible for coverage in the Preferred Risk Program of the **NFIP**:

> The coverage limits specified below will be reduced by any payments available through the **NFIP** policy insuring the **residence** or if the **residence** is ineligible for an **NFIP** policy or eligible to be written under an **NFIP** policy but there is no such policy in effect, then we will pay only for the amount of loss in excess of the maximum limit that can be insured under the **NFIP** policy. If we provide broader coverage than the **NFIP** policy, we will pay the difference in conditions not to exceed the limits defined below whether or not you can collect on the **NFIP** policy.

> The most we will pay for each **occurrence** is as follows:

> 1. We will pay up to the lesser of $250,000; the "Coverage A – Building Property Limit" listed on the most recent **NFIP** Declarations Page; or the coverage limits shown on your Declarations Page for **property damage** to your **house** and **other permanent structures**.

> 2. We will pay up to the lesser of $100,000; the "Coverage B – Personal Property Limit" listed on the most recent **NFIP** Declarations Page; or the coverage limit shown on your Declarations Page for **property damage** to your **contents** located at the covered residence.

> 3. We will pay up to $250,000 for Additional Living Expenses....

The flood endorsement defined Special Hazard Area as:

> **Special Flood Hazard Area (SFHA)** means an area having special **flood**, or **mudflow**, and/or **flood**-related erosion hazards, and shown on a **Flood** Hazard Boundary Map or **Flood** Insurance Rate Map as Zone A, AO, A1-A30, AE, A99, AH, AR, AR/A, AR/AE, AR/AH, AR/AO, AR/A1-A30, V1-V30, VE, or V.

The flood endorsement of the AIG policy indicated that McKernan's residence at 18722 Lake Harbour Avenue in Baton Rouge was assigned Flood zone B, C, or X and subject to coverage limits of $250,000 structure/$100,000 contents/$250,000 additional living expenses.

McKernan renewed her policy every year thereafter until 2016, with the effective policy dates as follows: December 1, 2009 to December 1, 2010; December 1, 2010 to December 1, 2011; December 1, 2011 to December 1, 2012; December 1, 2012 to December 1, 2013; December 1, 2013 to December 1, 2014; December 1, 2014 to December 1, 2015; and December 1, 2015 to December 1, 2016. A renewal contract, such as McKernan's AIG policy, contains the same terms and conditions as the existing policy. The word "renewal" in the context of insurance has a definite legal meaning. "Renewal" means that the original policy shall be repeated in substance and in fact. The new policy is identical, except as to the date of its expiration. **Gaylord Container Corp. v. CNA Ins. Companies,** 99-1795 (La. App. 1st Cir. 4/3/01), 807 So. 2d 864, 873, <u>writs denied</u>, 2001-2368, 2001-2376 (La. 12/07/01), 803 So. 2d 31.

However, when McKernan renewed her policy in 2013, the policy was not identical—the flood endorsement of the AIG policy indicated that McKernan's residence at 18722 Lake Harbour Avenue in Baton Rouge was now assigned to "Flood zone A or V," meaning her residence was designated as a Special Hazard Area, and her flood coverage changed to "excess" or "DIC" coverage, subject to coverage limits of $250,000 structure/$100,000 contents/$250,000 additional living expenses. Thus, the policy in effect at the time her residence flooded on August 14, 2016, indicated that her residence was located in Flood zone A or V, and subject to "excess" or "DIC" coverage. The existence of these differences in the policies does not change the AIG policy's status as a renewal. Rather, if there is a change in the conditions or terms of the policy, it is the duty of the insurer to call attention to the change; otherwise, the change can be no part of the contract, and the renewal contract is subject to reformation to make it conform to the original contract. **Gaylord Container Corp.,** 807 So. 2d at 873-75.

18

AIG admitted that while its practice is to send a "change notice" to its insureds when there is a change in coverage at the time a policy is renewed, AIG did not provide notice to McKernan in 2013 that her home's flood zone designation had changed, although AIG *did* deliver McKernan a copy of her 2013-2014 policy containing the change. The evidence demonstrates that McKernan timely received copies of every AIG policy covering her property from 2008 to 2016; however, she admitted that she did not read the content of her policies, so she was unaware that her flood zone designation had consequently changed, which changed her flood coverage. The failure of an insured to read the contract of insurance does not relieve the insurer of its duty to call an insured's attention to the changes made to a renewal policy. An insured has the right to presume that the policies were issued in accordance with the original policy, until expressly notified to the contrary. **Gaylord Container Corp.**, 807 So. 2d at 875.

Due to AIG's admitted failure to send notice McKernan that her flood zone designation and flood coverage had changed, AIG agreed to reform the policy and provide McKernan flood coverage under the 2015-2016 policy as if her home was located in the first zone (designated Flood zones B, C, or X and eligible for the Preferred Risk Program of the NFIP), and provide her flood coverage with limits of $250,000 structures/$100,000 contents/$250,000 additional living expense. If an insurer has agreed to renew a policy, but in fact issues a new policy containing different terms, the policy may be reformed to read the same as the original policy. **Easley v. Boston Ins. Co.**, 132 So. 2d 654, 656 (La. App. 1st Cir. 1961) (citing **Maryland Cas. Co. v. Kramel**, 80 So. 2d 897, 899-900 (La. App. 2nd Cir. 1955). See also **Gaylord Container Corp.**, 807 So. 2d at 873; **Billiot v. Sentry Ins.**, 366 So. 2d 1017, 1020 (La. App. 1st Cir. 1978), writ denied, 368 So. 2d 125 (La. 1979); **Adams v. Ross**, 300 So. 2d 192, 199 (La. App. 1st Cir. 1974). Accordingly, AIG paid McKernan $250,000 for flood damage to her structures and $100,000 for

flood damage to her contents. In the year following the flood, AIG paid Ms. McKernan a total of $162,000 in additional living expenses.

Based on the foregoing evidence, we find that AIG was entitled to partial summary judgment as a matter of law. Because it failed to provide notice concerning the changes made to McKernan's renewal policy, AIG was entitled to reform McKernan's policy, to make it conform to the original contract of insurance. See **Gaylord Container Corp.**, 807 So. 2d at 875. Accordingly, McKernan's first and second assignments of error are without merit.

## PEREMPTION OF McKERNAN'S PROFESSIONAL MALPRACTICE CLAIM AGAINST BOURG

In her third assignment of error, McKernan argues that the trial court erred in sustaining Bourg's peremptory exception raising the objection of peremption as to her professional malpractice claim against Bourg.[18]

An insurance agent who undertakes to procure insurance for another owes an obligation to his client to use reasonable diligence in attempting to place the insurance requested and to notify the client promptly if he has failed to obtain the requested insurance. **J & M Pile Driving, LLC v. Chabert Ins. Agency, LLC,** 2017-0126 (La. App. 1st Cir. 10/25/17), 233 So. 3d 43, 46 (citing **Karam v. St. Paul Fire & Marine Ins. Co.,** 281 So. 2d 728, 730 (La. 1973)). The client may recover from the agent the loss he sustains as a result of the agent's failure to procure the desired coverage if the actions of the agent warranted an assumption by the client that he was properly insured in the amount of the desired coverage. **J & M Pile Driving, LLC,** 233 So. 3d at 46 (citing **Karam,** 281 So. 2d at 730-31). To

---

[18] Following a hearing, the trial court signed the November 18, 2019 judgment sustaining Bourg's objection of peremption. The November 18, 2019 judgment decreed, in pertinent part:

> IT IS ORDERED, ADJUDGED AND DECREED, that the Peremptory Exception of Peremption is SUSTAINED, thereby dismissing Plaintiff's claims against the Bourg Defendants, **with Prejudice** and at Plaintiff's cost[.]

(Emphasis in original).

recover for losses resulting from an insurance agent's failure to procure insurance coverage, the plaintiff must establish: (1) an undertaking or agreement by the insurance agent to procure insurance; (2) failure of the agent to use reasonable diligence to obtain insurance and to notify the client promptly of the absence of coverage; and (3) actions by the agent which warranted the client's assumption that he was insured in the amount of the desired coverage. **J & M Pile Driving, LLC**, 233 So. 3d at 46 (citing **Prest v. Louisiana Citizens Property Ins. Corp.**, 2012-0513 (La. 12/4/12), 125 So. 3d 1079, 1086).

Actions for insurance agent malpractice are governed by La. R.S. 9:5606, which provides, in pertinent part:

> A. No action for damages against any insurance agent…shall be brought unless filed in a court of competent jurisdiction and proper venue within **one year from the date of the alleged act, omission, or neglect,** or within **one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered.** However, even as to actions filed within one year from the date of such discovery, in all events such actions **shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.**
>
> ***
>
> D. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.

(Emphasis added). As provided for in La. R.S. 9:5606(D), these one-year and three-year periods of limitation are peremptive periods.[19] **Atain Speciality Ins. Co. v. Premier Performance Marine, LLC**, 2015-1128, 2015-1129 (La. App. 1st Cir. 4/8/16), 193 So. 3d 187, 189.

---

[19] Liberative prescription is a mode of barring actions as a result of inaction for a period of time. La. C.C. art. 3447. Peremption is a period of time fixed by law for the existence of a right. Unless timely exercised, the right is extinguished upon expiration of the peremptive period. La. C.C. art. 3458. Peremption has been likened to prescription, in that peremption is prescription that is not subject to renunciation, interruption, or suspension. See La. C.C. art. 3461; **LaFourche Par. Water Dist. No. 1 v. Digco Util. Constr., L.P.**, 2018-1112 (La. App. 1st Cir. 3/13/19), 275 So. 3d 20, 22-23, writ denied, 2019-0577 (La. 6/17/19), 274 So. 3d 1257.

21

Peremption may be raised by a peremptory exception. See La. C.C.P. art. 927(A)(2). At the hearing on the exception of peremption, evidence may be introduced to support or controvert the exception. See La. C.C.P. art. 931. Here, although exhibits were attached to the memoranda filed by the parties, no evidence was introduced at the hearing in support of or in opposition to the objection of peremption. See **Atain Speciality Ins. Co.**, 193 So. 3d at 189. Unless properly offered and introduced into evidence, documents attached to memoranda do not constitute evidence and cannot be considered as such on appeal. **Atain Speciality Ins. Co.**, 193 So. 3d at 190.[20] In the absence of evidence, an exception of peremption must be decided based upon the facts alleged in the petition with all of the allegations accepted as true. **Atain Speciality Ins. Co.**, 193 So. 3d at 190. Where no evidence is introduced to support or controvert the exception, as in this case, the manifest error standard of review does not apply, and the appellate court's role is to determine whether the trial court's ruling was legally correct. **Atain Speciality Ins. Co.**, 193 So. 3d at 190.

Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception raising the objection of peremption. See **Carter v. Haygood**, 2004-0646 (La. 1/19/05), 892 So. 2d 1261, 1267. However, if peremption is evident on the face of the pleadings, then the burden shifts to the other party to show that the claim is not perempted. **Rando v. Anco Insulations Inc.**, 2008-1163, 2008-1169 (La. 5/22/09), 16 So. 3d 1065, 1082.

Although Bourg attached exhibits to his memorandum in support of the objection of peremption and alternative motion for partial summary judgment, the

---

[20] We recognize that under La. C.C.P. art 966(D)(2), the trial court "may consider only those documents filed in support of or in opposition to the motion for summary judgment and shall consider any documents to which no objection is made." The trial court granted Bourg's alternative motion for partial summary judgment, and McKernan has appealed that ruling. Accordingly, the merits of Bourg's alternative motion for partial summary judgment are before this court and will be discussed in our review of McKernan's fourth assignment of error, *infra*. Cf. **Atain Speciality Ins. Co.**, 193 So. 3d at 190 n.3.

exhibits were not introduced into evidence at the hearing on the peremptory exception raising the objection of peremption. We shall therefore review the appeal of the peremptory exception raising the objection of peremption based on the face of the pleadings, accepting all of McKernan's allegations as true. See **Hoogacker v. Hughes**, 2017-1500 (La. App. 1st Cir. 7/10/18), 2018 WL 3372667, at *2 (unpublished), writ denied, 2018-1306 (La. 11/5/18), 255 So. 3d 1056. McKernan alleged as follows, in pertinent part:

> Beginning in 2008, [McKernan] began to obtain insurance from [Bourg] for her personal home, as well [as] insurance for other possible liabilities and perils. **[McKernan's] practice was to always insure maximum coverage.** In particular, insurance coverage for her home included full replacement costs, as well as full repayment coverage for her contents. At the time she began her relationship with Bourg, her home was not within a flood zone. **[McKernan] believed that replacement insurance coverage covered any possible peril, including possible damage caused by flooding.**

> \*\*\*

> In fact, on or about October 6, 2015, [McKernan's] assistant emailed [Bourg] confirming insurance coverage providing replacement cost on [McKernan's] home. **Bourg's response led [McKernan] to believe that she did, in fact, have full replacement value on her home, less "recoverable depreciation."**

> \*\*\*

> Less than a year later, on August 14, 2016, [McKernan's] home flooded as the result of "The Great Flood" in which significant rain fell causing flooding of nearby bayous, rivers, and other waterways. [McKernan's] home, including its structure and immovable fixtures, sustained substantial damage. Similarly, a significant portion of the contents in her home were damaged or destroyed during the flood. The damage to her home and contents exceeded one million dollars.

> \*\*\*

> After the flood water receded, [McKernan] contacted her insurance agent, [Bourg], to make an insurance claim for the damage she sustained. **Much to her surprise and in direct conflict with the representations made by her insurance agent, as well**

23

as a reasonable expectation[ ] based upon her years long experience purchasing insurance covering the full replacement value of her home through Bourg regardless of the peril experienced, as well as the October 6, 2015 email and Bourg's response, [McKernan] learned that the only flood insurance she had was through [AIG]. That policy provided excess flood coverage to a non-existent underlying primary flood policy. In other words, **Bourg obtained an excess policy of insurance** (providing insurance coverage over a primary policy) **but failed to obtain a primary flood policy.** Most importantly, this coverage did not include full replacement cost for her home as confirmed in the October 2015 emails. Further, **Bourg failed to inform [McKernan] of this lack of coverage prior to the flood.**

\*\*\*

[McKernan] also learned that the AIG policy only provided $250,000 in excess coverage for structural damage and $100,000 for contents coverage.

\*\*\*

Upon investigation by [McKernan], it was disclosed that, unknown to [McKernan], [AIG] ... "inadvertently pulled" a flood report which "caused [McKernan's] flood zone to change from primary flood to DIC (difference in conditions). [AIG] ... admitted that it did not advise [McKernan] of this change and [McKernan] was unaware of it."

\*\*\*

Upon information and belief, either **Bourg was himself unaware of this change and / or failed to inform [McKernan] of it** until after her property was destroyed by flooding. Importantly, [McKernan] was never informed that she was only insured for $500,000 — as a best case scenario — or that AIG had "pulled" a flood report, changing the status of her insurance coverage, and making the AIG policy an excess policy over a non-existent primary policy. **Before that time, [McKernan] believed that she was covered for all casualties up to the limits of her potential exposure should any peril occur.** Had [McKernan] been informed of this change by AIG and / or Bourg, she would have had the opportunity to increase her coverage for possible flood damage, consistent with her other insurance coverages and her practice.

\*\*\*

24

Upon information and belief, **Bourg mistakenly believed that the AIG policy was a primary policy and he was unaware that there was any change made by AIG,** causing the AIG policy to become an excess policy over a non-existent primary policy.

\* \* \*

Further, even if a primary policy was properly secured by her insurance agent, [McKernan's] flood insurance would still have been woefully inadequate to protect her home from the flood damage she sustained, and **not have constituted full replacement coverage as requested and confirmed by Bourg.**

(Emphasis added).

As set forth in La. R.S. 9:5606, McKernan had to file suit within one year from the date of Bourg's alleged malpractice, or within one year from the date that Bourg's alleged malpractice was discovered or should have been discovered, or at the latest, within three years from the date of Bourg's alleged malpractice. As explained by the Supreme Court in **Campo v. Correa,** 2001-2707 (La. 6/21/02), 828 So. 2d 502, 510-11:

> Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription.

(Citations omitted).

In the instant case, McKernan requested that Bourg provide her with "maximum coverage" on her homeowner's and flood insurance policies covering her home, as well as "full replacement costs" and "full repayment coverage for her

25

contents." McKernan renewed her initial AIG policy, effective December 1, 2008 to December 1, 2009, every year until 2016.

Because McKernan admitted that she did not read the AIG policies in question upon receipt, it is undisputed that she did not have actual knowledge of the facts demonstrating that she was the victim of Bourg's malpractice. See **C's Disc. Pharmacy, Inc. v. Pacific Ins. Co., Ltd.**, 2009-217 (La. App. 5th Cir. 1/26/10), 31 So. 3d 1103, 1107. Although we are mindful of the line of cases imposing a duty upon the insured to read her policy and know its contents, we note that those cases specifically refer to instances where an insured raises claims against her insurer, not her insurance agent. See, _e.g._, **Gaylord Container Corp.**, 807 So. 2d at 875.

After carefully reviewing the particular facts and circumstances involved in this case, it is clear that McKernan relied on Bourg to manage her various insurance coverages spanning multiple properties. McKernan relied on Bourg to procure the insurance policies she requested and to inform her as to any policy changes or revisions. McKernan alleged that Bourg assured her that she had a "full coverage" primary flood insurance policy. The salient issue is when McKernan knew or should have known that the AIG policy procured by Bourg did not provide the coverage she wanted. See **Roadhouse Bar-B-Que, Inc. v. Certain Underwriters at Lloyds**, 2004-1697 (La. App. 3rd Cir. 5/4/05), 909 So. 2d 619, 623. We find under these facts that the presumption that an insured is continually put on notice of the contents of an insurance policy is not applicable as between a client and her insurance agent. An insurance policy is a complex instrument requiring analysis to understand it. See **St. Paul Fire & Marine Ins. Co. v. Valentine**, 95-0649 (La. App. 1st Cir. 11/9/95), 665 So. 2d 43, 46, writ denied, 95-2961 (La. 2/9/96), 667 So. 2d 534. We recognize that this is exactly why a client hires an insurance agent. The agent is retained to procure and advise as to the

26

coverages requested and should not be heard to claim that the client should have read the insurance policy and discovered that agent's negligent acts. If the client had read and understood the insurance policy, the client would have no need to hire the insurance agent.

Because the time limitation set forth in La. R.S. 9:5606 is peremptive, the continuing tort doctrine, which is a suspensive principle, is inapplicable to claims governed by this statute. **State ex rel. Div. of Admin., Office of Risk Mgmt. v. Nat'l Union Fire Ins. Co. of Louisiana**, 2007-1134 (La. App. 1st Cir. 2/8/08), 984 So. 2d 91, 94, writ denied, 2008-0548 (La. 4/25/08), 978 So. 2d 370. Furthermore, subsequent renewals of insurance policies generally do not operate to restart peremption. **Sitaram, Inc. v. Bryan Ins. Agency, Inc.**, 47,337 (La. App. 2nd Cir. 9/19/12), 104 So. 3d 524, 530, writ denied, 2012-2283 (La. 11/30/12), 103 So. 3d 375. However, renewals may be the basis of separate torts, if the complained of conduct constitutes separate and distinct acts, which give rise to immediately apparent damages. **Sitaram, Inc.**, 104 So. 3d at 530. The question of whether alleged acts or omissions of an insurance agent constitute separate torts has arisen in the context of policy renewals, where the failure to procure certain coverage is repeated with each subsequent renewal. **State ex rel. Div. of Admin., Office of Risk Mgmt.**, 984 So. 2d at 95. In this context, the courts have concluded that where there is no contact between the agent and the insured subsequent to issuance of the original policy, the mere renewal of a policy will not constitute a separate tort. **State ex rel. Div. of Admin., Office of Risk Mgmt.**, 984 So. 2d at 95. However, the agent may commit a separate tort subsequent to the original issuance of the policy where the agent subsequently discusses coverage with the client prior to or at the time of renewal. **State ex rel. Div. of Admin., Office of Risk Mgmt.**, 984 So. 2d at 95. See, _e.g._, **Bel v. State Farm Mut. Auto. Ins. Co.**, 2002-1292 (La. App. 1st Cir. 2/14/03), 845 So. 2d 377, 382, writ denied, 2003-0733 (La.

27

5/30/03), 845 So. 2d 1057,[21] and **Biggers v. Allstate Ins. Co.**, 2004-282 (La. App. 5th Cir. 10/26/04), 886 So. 2d 1179, 1182.[22] Cf. **Sonnier v. Louisiana Farm Bureau Mut. Ins. Co.**, 2005-1006 (La. App. 3rd Cir. 3/1/06), 924 So. 2d 419, 420, writ denied, 2006-0704 (La. 5/26/06), 930 So. 2d 33.[23]

Here, according to the allegations of the petition, McKernan and Bourg communicated yearly about McKernan's AIG policy to ensure appropriate coverages, as well as to add or delete coverage. As alleged by McKernan, Bourg discussed coverage with McKernan prior to or at the time of renewal each year.

_____

[21] In **Bel**, plaintiffs sued their insurance agent for negligence in advising them that they did not need UM coverage under a personal liability umbrella policy. **Bel**, 845 So. 2d at 380-81. Plaintiffs filed suit against their agent in 1998; however, they had last signed a form rejecting UM coverage in 1994. In an attempt to avoid the effects of La. R.S. 9:5606, plaintiffs argued that each time the policy was renewed, their agent misrepresented the nature of their coverage, which constituted a new, separate and distinct tort. **Bel**, 845 So. 2d at 381.

This court rejected that argument, concluding that the renewals of the policy were simply a continuation of the effects of the original wrongful act and not separate and distinct torts, noting that after the initial rejections were signed, the rejection of UM coverage under the policy remained effective for the life of the policy. No additional rejection was necessary when a renewal was issued, nor had the insureds discussed their coverage with the agent subsequent to signing the original UM rejection forms in 1994. Thus, the court concluded that there was no occasion for the agent to misrepresent the nature of plaintiffs' coverage or the implications of not having UM coverage after the initial rejection forms were signed. **Bel**, 845 So. 2d at 382.

[22] Similarly, in **Biggers**, the plaintiffs purchased homeowners insurance in 1995, at which time they requested coverage for their jewelry and silverware. In 2002, their home was burglarized, and their jewelry and silverware were stolen. Plaintiffs then discovered that their agent had not, as requested, obtained the additional coverage for the jewelry and silverware. However, when plaintiffs sued their agent for negligence, the agent filed an exception, raising as a defense the peremptive periods set forth in La. R.S. 9:5606. **Biggers**, 886 So. 2d at 1180. Plaintiffs argued that each time the policy was renewed, their agent failed to point out the inadequacy of their coverage, actions which constituted a continuing tort or a new tort. **Biggers**, 886 So. 2d at 1182. The Fifth Circuit rejected plaintiffs' argument, noting that after the issuance of the original policy, there was no occasion for the agent to misrepresent the coverage. **Biggers**, 886 So. 2d at 1183.

[23] Comparatively, in **Sonnier**, when plaintiffs purchased homeowners insurance in 1998, they requested replacement cost coverage, but their agent told them that replacement cost coverage was not available in their parish. Each year at renewal, plaintiffs again requested replacement cost coverage and were told it was unavailable. When plaintiffs later made a claim under their policy, they were informed that their insurance company did, in fact, offer replacement cost coverage. Plaintiffs then filed suit against their agent for his failure to inform them of the available coverage. **Sonnier**, 924 So. 2d at 420.

Although the agent contended that plaintiffs' claim was perempted pursuant to La. R.S. 9:5606, the Third Circuit rejected that argument, noting that each time the policy came up for renewal, plaintiffs sought replacement coverage and were denied. Thus, the court concluded that each failure by the agent to inform plaintiffs of the availability of replacement cost coverage, when they requested such coverage at renewal, constituted a separate act. Because plaintiffs had filed suit within one year of discovering the availability of such coverage and within three years of the agent's last failure to notify plaintiffs of the coverage, their suit was not perempted by La. R.S. 9:5606. **Sonnier**, 924 So. 2d at 422.

See **State ex rel. Div. of Admin., Office of Risk Mgmt.**, 984 So. 2d at 95. Bourg failed to inform McKernan that when her AIG policy renewed in 2013, and every subsequent renewal year prior to the flood in 2016, the flood zone designation on her residence changed, thus eliminating McKernan's primary flood insurance coverage. McKernan alleged that Bourg assured her that she had full coverage.

In the instance case, Bourg failed to inform McKernan that she no longer had primary flood insurance beginning with the renewal of the AIG policy December 1, 2013-December 1, 2014, and that failure continued with two subsequent renewals, December 1, 2014-December 1, 2015, and December 1, 2015-December 1, 2016. Each failure to inform McKernan of the change in her flood coverage, as well as the lack of adequate coverage as requested by her, constituted a separate tort subsequent to the original issuance of the policy. See **State ex rel. Div. of Admin., Office of Risk Mgmt.**, 984 So. 2d at 95. See also, _e.g._, **Sonnier**, 924 So. 2d at 422. Because McKernan filed suit within one year of discovering Bourg's malpractice and within three years of Bourg's last failure to notify McKernan of the change in her coverage, her suit was not perempted by La. R.S. 9:5606. See **State ex rel. Div. of Admin., Office of Risk Mgmt.**, 984 So. 2d at 95; **Sonnier**, 924 So. 2d at 422; **Atain Speciality Ins. Co.**, 193 So. 3d at 190-91; **Sitaram, Inc.**, 104 So. 3d at 530-31.

Because the claims against Bourg are not perempted on the face of the pleadings, the burden was on Bourg to prove the facts to support its exception of peremption. See **Rando**, 16 So. 3d at 1082. No evidence was introduced at the hearing of the peremptory exception raising the objection of peremption and, on the face of the record before us, we find that Bourg failed to carry that burden. See **Atain Speciality Ins. Co.**, 193 So. 3d at 191. Therefore, we find that the trial court legally erred in sustaining the objection of peremption and dismissing the professional malpractice claim raised by McKernan against Bourg.

29

## BOURG'S ALTERNATIVE MOTION FOR
## PARTIAL SUMMARY JUDGMENT

In her fourth assignment of error, McKernan maintains that genuine issues of material fact preclude summary judgment on her cause of action arising from Bourg's alleged negligent misrepresentation contained in an October 6, 2015 email regarding the extent of flood coverage under the AIG policy.[24] Whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. **Georgia-Pacific Consumer Operations, LLC**, 255 So. 3d at 22.

To recover on a claim of negligent misrepresentation, a plaintiff must prove: (1) a legal duty on behalf of the agent to supply correct information; (2) a breach of that duty; and (3) damages resulting from justifiable reliance on that misrepresentation. **Serv. One Cable T.V., Inc. v. Scottsdale Ins. Co.**, 2011-1470 (La. App. 1st Cir. 2/10/12), 2012 WL 602211, at *7 (unpublished).

Bourg sought partial summary judgment, in the alternative, to his objection of peremption on the basis that the only act of alleged malpractice that occurred within three years of McKernan filing suit was a "negligent misrepresentation" he allegedly made in an October 6, 2015 email response to a question posed by McKernan's assistant, Nyla Williams. In support of his motion for partial summary judgment, Bourg submitted the AIG policies as well as the October 6, 2015 email exchange at issue. The email exchange began when Williams, on

---

[24] Following a hearing, the trial court signed the November 18, 2019 judgment granting Bourg's alternative motion for partial summary judgment and dismissing McKernan's negligent misrepresentation claim against Bourg, with prejudice. The November 18, 2019 judgment decreed, in pertinent part:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the Alternative Motion for Summary Judgment, filed by the Bourg Defendants, is GRANTED, thereby dismissing Plaintiff's negligent misrepresentation claim arising out of the October 6, 2015 e-mail exchange between Brad Bourg and Plaintiff's assistant, Nyla Williams, **with Prejudice** and at Plaintiff's cost.

(Emphasis in original).

behalf of McKernan, sent an email to Bourg on October 6, 2015, wherein she stated:

> Instead of me spending hours reading all the various insurance policies, maybe you can answer this for me. I thought we had replacement cost insurance on [McKernan's] home and the commercial buildings. I just noticed on the 8710 Jefferson Highway claim with Banker's Insurance[,] they deducted [$]967.75 for Recoverable Depreciation. That paint was only 1 year old[,] and the carpet isn't even a year [old] because we did all of that before the tenant moved in.
>
> Are we not able to get replacement cost on business insurance?
>
> Do any of these have replacement cost included?
>
> - 18722 Lake Harbour Ave (main home – based on recent payment I think that was replacement cost)
> - 8710 Jefferson Hwy, Baton Rouge, LA (Bankers Insurance)
> - These 4 on the same policy:
>   - 17513 Old Jefferson Hwy, Prairieville, LA (Liberty Mutual)
>   - 7503 Old Jefferson Hwy, Prairieville, LA (Liberty Mutual)
>   - 17517 Old Jefferson Hwy, Prairieville, LA (Liberty Mutual)
>   - 17505 Old Jefferson Hwy, Prairieville, LA (Liberty Mutual)
>
> Thank you!

Bourg responded to Williams' October 6, 2015 email that same day, stating:

> Recoverable depreciation is normally used to make sure the property owner repairs the property. So, once you make the repairs and submit the receipt showing the work has been done, they send you that amount back.
>
> Ask you[r] adjustor about this.

Because Bourg will not bear the burden of proof at trial on McKernan's negligent misrepresentation claim, Bourg needed only to point out to the court the absence of factual support for one or more elements essential to McKernan's negligent misrepresentation claim. See La. C.C.P. art. 966(D)(1). Here, Bourg pointed out the absence of factual support for the second element of McKernan's negligent misrepresentation claim—whether Bourg breached his legal duty as an insurance agent to supply correct information. Bourg's evidence, specifically the

31

October 6, 2015 email exchange, demonstrated that the scope of Williams' inquiry and Bourg's responses was limited to recoverable depreciation under her AIG policy, *i.e.*, whether McKernan was entitled to replacement costs under her AIG policy for repairs she made to her home and other properties. Williams did not inquire about flood insurance or flood coverage on McKernan's home under the AIG policy. In response to Williams' email, Bourg made no incorrect or false representations regarding flood coverage or flood coverage limits on McKernan's home under the AIG policy. Neither Williams nor Bourg even referenced or discussed flood insurance under McKernan's AIG policy. Because Bourg made no statements regarding McKernan's flood coverage, none of his statements could even be considered incorrect, false, or misleading regarding McKernan's flood insurance coverage.

Based on our *de novo* review of the evidence submitted in support of Bourg's motion for partial summary judgment, we find that Bourg pointed out an absence of factual support as to one of the essential elements of McKernan's negligent misrepresentation claim regarding the October 6, 2015 email exchange. See **Jenkins**, 305 So. 3d at 371; **Crockerham**, 255 So. 3d at 608.

The burden then shifted to McKernan to put forth evidence establishing the existence of a genuine issue of material fact or that Bourg is not entitled to judgment as a matter of law. See La. C.C.P. art. 966D(1); **Babin**, 764 So. 2d at 40. In opposition, McKernan argued that based on the *totality* of her communication with Bourg, including but not limited to communication occurring before and after the October 6, 2015 email exchange, she believed and reasonably relied upon Bourg's representations that she had the same coverage limits for flood coverage as she did for all other covered perils under the AIG policy. McKernan argued that the October 6, 2015 email is just one instance demonstrating her reliance on

Bourg's expertise to manage the insurance program covering all her properties, including answering periodic questions regarding her coverages generally.

Our *de novo* review of the evidence submitted by McKernan in opposition to Bourg's motion for partial summary judgment did not reveal the existence of a genuine issue of material fact. See La. C.C.P. art. 966(D)(1). The issue set forth in Bourg's motion for partial summary judgment was the claim of negligent misrepresentation based upon the October 6, 2015 email exchange, not other communications. McKernan did not produce factual evidence sufficient to establish that she would be able to meet her burden at trial of proving by a preponderance of the evidence that Bourg's statements contained in the October 6, 2015 email were incorrect, false, or misleading. See **Babin**, 764 So. 2d at 40. Therefore, we find no error in the trial court's judgment granting partial summary judgment in favor of Bourg on the negligent misrepresentation claim arising out of the October 6, 2015 email exchange.

**DECREE**

We affirm the trial court's November 4, 2019 judgment. We reverse the portion of the trial court's November 18, 2019 judgment that sustained the peremptory exception raising the objection of peremption in favor of the defendants/appellees, Bourg Insurance Agency, Inc. and agent Brad Bourg, which dismissed the professional malpractice claim of the plaintiff/appellant, Diane McKernan. We affirm the portion of the trial court's November 18, 2019 judgment that granted partial summary judgment in the alternative in favor of the defendants/appellees, Bourg Insurance Agency, Inc. and agent Brad Bourg, which dismissed the negligent misrepresentation claim of the plaintiff/appellant, Diane McKernan, arising out of the October 6, 2015 email exchange between Brad Bourg and Diane McKernan's assistant, Nyla Williams. We remand this matter to the trial court for further proceedings consistent with this opinion. All costs of this

appeal are assessed equally between the plaintiff/appellant, Diane McKernan, and the defendants/appellees, Bourg Insurance Agency, Inc. and agent Brad Bourg.

**NOVEMBER 4, 2019 JUDGMENT AFFIRMED; NOVEMBER 18, 2019 JUDGMENT REVERSED IN PART AND AFFIRMED IN PART; AND REMANDED.**